In re the MARRIAGE OF Oscar CERVEN and Emelyn Cerven.

Upon the Petition of Oscar Cerven, Appellee,

And Concerning Emelyn Cerven, Appellant.

No. 68533.

Supreme Court of Iowa.

June 5, 1983.

Steven J. Woolley of Polack & Woolley, Omaha, Neb., for appellant.

Verd R. Bailey of Davidson & Bailey, Clarinda, for appellee.

Considered by REYNOLDSON, C.J., and McGIVERIN, LARSON, SCHULTZ and WOLLE, JJ.

McGIVERIN, Justice.

Both parties appeal from the economic provisions of the decree which dissolved their marriage. Respondent Emelyn Cerven claims the provisions are inadequate, and petitioner Oscar Cerven says they are excessive. We affirm the $5,000 property settlement to Emelyn and reverse and modify the decree to provide Emelyn with alimony in the amount of $500 per month; we also affirm the award to Emelyn of $500 in trial attorney fees, and the division of the parties' debts.

This appeal is also accompanied by numerous motions. The parties have stipulated that all motions, with the exception of Emelyn's application for attorney fees, printing costs, costs and other indebtedness, are moot. We approve the parties' stipulation and will not consider the mooted motions further.

Oscar and Emelyn were married on July 23, 1973. At the time of the marriage Oscar was 75 and Emelyn was 73. Oscar's first wife of many years had died in December 1970 and this was his second marriage. Emelyn was recently divorced, and the marriage to Oscar was her third.

Three days prior to their marriage Oscar and Emelyn signed an antenuptial agreement. In substance, the agreement provided that neither would acquire any right in the property of the other by virtue of the marriage. At the time of the marriage Emelyn owned property worth $4,986.57 while Oscar's total equity was approximately $136,000.

For the first year the couple apparently enjoyed a harmonious marital relationship. However, after about a year of marriage, Emelyn fell and broke her wrist and after that her health deteriorated and her behavior changed. Oscar claimed that the change in Emelyn's mental attitude made his life "pretty miserable."

In December 1977 Emelyn's condition had deteriorated to such an extent that her daughter by a previous marriage took her from the marital home and placed her in a nursing home. A guardian and conservator was appointed for Emelyn on April 10, 1978. In that probate proceeding Oscar was ordered to support Emelyn. He contributed to her support from January of 1978 through June of 1981, paying $34,845.19.

Between May 30 and June 12, 1980, Oscar transferred the bulk of his assets to his children by his first wife. He filed a gift tax return indicating that these gifts had amounted to $105,065.48. For approximately one year after the gifts were made, Oscar's son Duane, who had received the bulk of Oscar's assets, gave Oscar $800–900 per month to enable him to make the support payments ordered by the probate court. In July of 1981, Duane ceased giving Oscar money and Oscar made no further support payments for Emelyn. The order in the conservatorship requiring these payments was voided on November 23, 1981, for lack of jurisdiction. That order was appealed, and we transferred the matter to the court of appeals. That action, however, is not relevant to the present appeal.

Oscar filed this petition for dissolution on October 21, 1981. At the time of trial his assets totaled $38,200, including a home val-

ued at $35,000; and Emelyn's equaled $4,507.08, plus a $3,000 certificate of deposit irrevocably pledged for funeral expenses. Emelyn was receiving $292.60 per month in Social Security benefits plus $10 per month in interest while Oscar received $280.70 per month from Social Security.

In its decree of April 8, 1982, the trial court awarded Emelyn a lump sum property settlement of $5,000, but no alimony. Oscar retained the house, free and clear of any claims by Emelyn and all of his personal property. The final decree also provided that all present outstanding and unpaid obligations incurred by the parties would be the separate obligation of each.

Both parties appeal the $5,000 property award and the trial court attorney fee award to Emelyn, and she also appeals from the denial of alimony and the division of their outstanding obligations. Emelyn also challenges the validity of the antenuptial agreement. Our review of this equity action is de novo. Iowa R.App.P. 4. We give weight to the fact findings of the trial court but are not bound by them. Iowa R.App.P. 14(f)(7).

I. *Validity of the antenuptial agreement.* Emelyn says the antenuptial agreement, which she and Oscar executed three days prior to their marriage, must be declared invalid because Oscar failed to make a full and fair disclosure of his assets. The trial court questioned the validity of the agreement also, but found that it was evidence of the parties' intention to maintain their separate assets. At oral arguments, Oscar's counsel conceded that the antenuptial agreement was invalid because of lack of disclosure. The parties, therefore, now agree that the antenuptial agreement should be considered invalid for purposes of this dissolution action. Accordingly, we will not consider the antenuptial agreement in our review of the economic provisions of the dissolution decree.

II. *Transfer of assets to the children.* An additional wrinkle in the parties' financial picture is the fact that Oscar transferred the bulk of his liquid assets to his children after he became obligated for

Emelyn's care in a nursing home. This transfer must be considered in our review of both the $5,000 property settlement and the denial of alimony to Emelyn. *See* Iowa Code § 598.21(1)(m) ("(1) [T]he court may grant an order requiring support payments ... after considering all of the following: ... (m) Other factors the court may determine to be relevant in an individual case."); and § 598.21(3)(j).

From the record, it is clear that Oscar did not feel a strong obligation to support Emelyn once she was placed in the nursing home; he felt that Title XIX benefits should be used. *See* 42 U.S.C. § 1396 et al. (1976) and Iowa Code ch. 249 (1981). We note, however, that the record shows Oscar had encouraged Emelyn to obtain a dissolution in order to marry him, and he further promised that he would take care of her. It is also quite clear that Emelyn's Social Security payments are inadequate to meet her nursing home and conservator expenses which were $1,126 per month at the time of trial.

Oscar asserts that he gave the bulk of his assets to his children because he "was getting old [and] wanted to see [his children] get something out of it before [he] passed away." This, however, was not the sole reason for the gifts. Oscar testified that he felt less obligation to support Emelyn, his second wife, than his first wife; he made the gifts so that support of Emelyn would not consume his assets. Concern over the expense of Emelyn's care was also expressed by Oscar's son, Duane Cerven. Duane testified that although he had no knowledge of his father's gifts until after the papers were drawn up, there had been some talk between Oscar and his children that Oscar should think of his children first and Emelyn second.

The gifts to Oscar's four children were made in the following manner:

—¼ interest to each child in vendor's realty contract, valued at $50,000;

—$5,000 certificate of deposit to each of three children; and

—$40,065.48 in certificates of deposit to son, Duane.

For a year after the gifts were made in 1980, Oscar supported Emelyn by the $800–900 per month which Duane returned to him.

This transfer by Oscar must be viewed in light of two well-established legal principles. First, a person with an obligation to support another is not relieved of that obligation by voluntarily reducing his income or assets. *See Ellis v. Ellis,* 262 N.W.2d 265 (Iowa 1978) (ex-husband whose income was reduced because of voluntary retirement denied modification of alimony award); *Reed v. Reed,* 260 Iowa 1166, 152 N.W.2d 190 (1967) (refusal to modify child support obligations of man who voluntarily quit job in order to return to college). Second, if the purpose of transferring one's assets prior to a dissolution of marriage is to protect oneself from future alimony payments, the court may look to the amount transferred in fixing alimony. *See Davis v. Davis,* 187 Iowa 407, 422, 173 N.W. 7, 11–12 (1919) (intervenor-transferee adjudged to have no property rights in personal property transferred in anticipation of support obligation); *Baker v. Baker,* 201 Neb. 409, 411–12, 267 N.W.2d 756, 758 (1978) (without adjudicating rights of transferee children, court included in property division one-half the value of negotiable bonds transferred to children by father in anticipation of divorce).

We have long recognized that it is "neither unnatural nor improper" to desire the bulk of one's estate to go to one's children. *Christians v. Christians,* 241 Iowa 1017, 1021, 44 N.W.2d 431, 433; *see also Gunsaulis v. Tingler,* 218 N.W.2d 575, 578 (Iowa 1974). However, this desire is improper when the inter vivos transfer is made in an attempt to escape one's support obligations. In such cases, we will not overlook the transfer in fixing alimony. *See Davis,* 187 Iowa 407, 173 N.W. 7.

We conclude that Oscar had genuinely mixed motives for his gifts: he wanted his children to enjoy his money during his lifetime, and he wanted to cease supporting Emelyn despite a probate court order that he do so. Oscar realized his first motive by surrendering his interest in the vendor's contract to his children in equal shares and by giving $5,000 to each of three children. He attempted to realize his second motive by giving over $40,000 to Duane, who returned the money necessary for Emelyn's support for one year after the so-called "gift" was made.

We hold that the $40,000 transfer to Duane was merely a sham gift made in an attempt to shield Oscar's assets from his present and future support obligations. Consequently, in reviewing the property settlement and in assessing Oscar's ability to pay alimony, we consider the additional $40,000 which he would have had, but for the transfer in his attempt to escape his obligation to support Emelyn.

III. *Alimony.* As stated above, Oscar had a duty to support Emelyn during the parties' marriage. At the time of the trial Emelyn's monthly expenses amounted to $1,126. "Alimony is an allowance to the ex-wife in lieu of the husband's legal obligation to support her." *In re Marriage of Hitchcock,* 309 N.W.2d 432, 437 (Iowa 1981). In light of the factors in section 598.21(3), we conclude that the trial court erred in failing to award Emelyn alimony. We hold that Oscar should contribute, until he or Emelyn dies, $500 per month to Emelyn's support from date procedendo issues.

IV. *Property settlement.* Both parties appeal from the $5,000 property settlement to Emelyn; Oscar claims it is excessive and Emelyn says it is inadequate. In making this award, the trial court took into consideration the approximate $35,000 which Oscar had paid for Emelyn's support while in the nursing home. This, we conclude, was error, but we reach the same result as to amount, due to accumulations on the assets of the parties during marriage.

While Emelyn was his wife, Oscar had a duty to support her. *St. Luke's Medical Center v. Rosengartner,* 231 N.W.2d 601, 602 (Iowa 1975) (husband liable for wife's

medical expenses even though they were separated at the time the expenses were incurred). Consequently, in determining the economic provisions of a dissolution decree the amount of such support is immaterial. Furthermore, no provision can allow for the recovery of support payments which were the duty of a spouse. Oscar cannot recover from Emelyn for the amounts he has already paid for her support.

We note also that neither section 598.-21(1) nor *Schantz v. Schantz,* 163 N.W.2d 398 (Iowa 1968), include expenses incurred in the support of a spouse as a factor which may be considered when determining the property division.

The trial court awarded Emelyn a $5,000 property settlement. We have reviewed the financial situation of both parties in light of the factors set forth in section 598.21(1), and conclude that the $5,000 award to Emelyn is equitable to both parties. It is affirmed.

V. *Attorney fees, costs and indebtedness.* The trial court awarded Emelyn $500 in attorney fees. Predictably, Oscar contends he is financially unable to contribute towards Emelyn's attorney fees. Emelyn says the fees awarded were inadequate. We believe the trial court considered the overall economic situation of the parties in making this award. We give weight to the trial court's findings and conclude that this award was justified and should not be altered. *In re Marriage of Beeh,* 214 N.W.2d 170, 176 (Iowa 1974).

Emelyn also complains of the division of the parties' indebtedness. The question of liability for the parties' outstanding obligations was addressed twice by the trial court: once in paragraph 5 of the original decree and again on Emelyn's ex parte application to insert a new paragraph 5. That paragraph, as modified, specifically states that the parties were responsible for their own present and future obligations:

> Except as otherwise ordered herein, all of the now outstanding and unpaid obligations incurred by or on behalf of Respondent and the Petitioner shall be their own separate obligation and each party

shall be responsible for debts incurred by each hereafter. . . .

Emelyn has already had an ex parte modification of paragraph 5 to her own liking; now on appeal she seeks a further modification. We give weight to the trial court's findings upon its final consideration of this provision and conclude that the division of liabilities should not be altered.

Lastly, we consider Emelyn's application requesting appellate attorney fees and costs, and assessment to Oscar of all of her outstanding indebtedness. Oscar resists this application.

We hereby deny Emelyn's request that all of her outstanding obligations and costs of the guardianship and conservatorship be assessed to Oscar. We view this merely as a further attack on paragraph 5 of the decree.

Emelyn has supported her application for appellate attorney fees and costs with affidavits and an itemized statement by her attorney. Without attempting to place a valuation on the attorney's services or what he should be paid, we simply determine that Oscar should contribute $1,500 towards Emelyn's attorney fees. Costs in this court are taxed to Oscar.

In sum, after consideration of all contentions raised by the parties and the factors set forth in section 598.21, we affirm in part, reverse in part, and modify the decree of the district court.

MODIFIED AND AFFIRMED IN PART; REVERSED IN PART.