**In re the MARRIAGE OF Wilma L. WILLIAMS and Fred Williams, Jr.**

**Upon the Petition of Wilma L. Williams, Petitioner–Appellant,**

**And Concerning Shirley Phillips, As Executrix of the Estate of Fred Williams, Jr., Deceased, Respondent–Appellee.**

**No. 86–1836.**

Court of Appeals of Iowa.

Jan. 27, 1988.

Ned A. Stockdale of Fitzgibbons Brothers, Estherville, for petitioner-appellant.

Thomas L. McCullough, Lake View, for respondent-appellee.

Heard by DONIELSON, P.J., and HAYDEN, and SACKETT, JJ.

SACKETT, Judge.

This case involves the issue of equitable division of substantial property acquired in a long-term marriage. We consider whether transfers of assets in violation of court orders and discovery abuses are appropriate factors to consider in making an equitable distribution. We determine them to be relevant factors. We modify the trial court's award.

### I. Procedural History

This case has been in the legal system for over five years and comes to us for the third time. The first time in 1984 in the unreported case of *Williams v. Richardson*, 368 N.W.2d 734 (Iowa App.1984), we affirmed a trial court's order finding Wilma Williams in contempt of court and sentencing her to serve a jail sentence for violating an injunction by selling some cattle and for failing to vacate the family home during a period Fred Williams was ordered to have possession. We did not and do not condone Wilma's actions in disobeying said orders but, after a total review of the record, we find the wrongdoing for which Wilma was found in contempt to be insignificant when compared to Fred's total sabotage of the dissolution process.

The second appeal came after the matter came on for trial. The district court heard evidence and appointed a special master who heard evidence and reported to the court. The trial court entered a decree ordering certain property be given to each party and ordered that other property be sold and debts paid. The trial court then ordered the master to reconvene to hear additional evidence regarding the acquisition of some stock and to determine how it would make a disposition of funds from the sale of property after the stock issue was determined. Before the master reconvened the decree was appealed and transferred to this court. We determined the parties had treated the decree as a final decree and we found it to be a final decree. We recognized there had been unresolved issues in the decree and there was a temptation to refuse to address the issues and remand the case. We elected not to do so finding the matter had been in our system long enough and the record was sufficient for us to make a decision. We rendered a decision wherein we found Fred made no attempt to implement discovery and had in fact impeded the process. We considered Fred's conduct particularly as it related to his credibility with reference to the disposition of assets under his control during the pendency of the action. We also found Fred had violated injunctions by forging Wilma's name to a state tax refund, executing a $250,000 confession of judgment and mortgage selling the assets of a family farm corporation and loaning $236,153.93 to a second farm corporation, found to be valueless. We modified the decree to give Fred his insurance policy, bank account and airplane, boat and car. We ordered the other assets go to Wilma and she be required to pay certain debts. We then directed if she were successful in having the confession of judgment and mortgage removed from the real estate she should be required to pay Fred $125,000 plus interest over a period of time. We also ordered Wilma to pay Fred alimony for a short period of time.

The supreme court saw fit to vacate our decision and remand to the district court by the following court order:

Respondent-appellee/cross-appellant's application for further review is hereby granted after consideration by this court en banc.

The decision of the court of appeals is hereby vacated. The case is hereby remanded to the district court, which shall by November 1, 1986 enter a final decree resolving issues not decided in the decree dated February 14, 1985. The district court may take additional evidence it deems necessary to resolve all remaining issues, and the court may also receive additional findings from the special master, so long as the final decree is entered no later than November 1, 1986.

The court shall treat the motel stock and lawsuits referred to in the decree of February 14, 1985, as assets or liabilities, as the case may be, as of the date of February 14, 1985, when the marriage was dissolved, and shall take those assets or liabilities into account in dividing the parties' property and debts and disposing of all economic issues. Either party may then appeal from any provisions of the resulting final decree.

Dated this 1st day of August, 1986.

The matter was returned to district court; additional evidence was heard by the master who made a report. A supplemental decree was entered. From the supplemental decree Wilma appealed and Fred cross-appealed. The case was again transferred to us.

## II. Transfers of Assets

Appellant/Cross–Appellee Wilma Williams filed a petition seeking a dissolution of her marriage to Fred Williams and asking for an equitable division of their property. Fred did not live to see a conclusion to these protracted proceedings. His executor has been substituted.

Concerned about the disposal of property, Wilma asked for and obtained on November 23, 1982, an ex parte order enjoining Fred from encumbering property and destroying, altering or concealing records. After a hearing the injunction was affirmed in December 1982, and made appli-

cable to Wilma. It was again affirmed on June 6, 1983, and May 29, 1984.

After the injunction was entered and before the trial court's decision which formed the basis of the second appeal Fred made the following transfers in violation of the restraining order and injunctions:

1. Withdrew funds in excess of $5,000 from several joint accounts and testified with reference to at least one he put the money in his pocket.

2. Received and forged Wilma's name on a jointly issued state income tax refund in the amount of $13,322.78. Fred does not deny the forgery. He argues it was all right because he contends he put the money in a family farm corporation.

3. Failed to account for a $26,846.24 loan repaid to him on February 11, 1984, by Shepherd of the Hills, a corporation he owned that had a motel as its major assets.

4. Made a loan to Verona Valley Farms, a family-owned Missouri farm corporation in the amount of $236,166.93.

5. Loaned to Mountain Grove, $37,990.81.

6. Sold 500 shares Artsway stock but made no accounting.

7. Sold or disposed of a boat and trailer.

8. Sold on September 26, 1983, at public auction, 71 head of livestock, extensive equipment including, among other things, seven tractors and accessory equipment, hay/straw, feeders, two grain aerators and dryers, wagons, sprayers, loaders, a combine, wagons, plows, 1971 Chevrolet truck, grain bins, 1975 Chevrolet ¾ ton truck, and extensive tools. No accounting was made.

9. On May 3, 1983, Fred gave to his attorney Tom McCullough and one Bierstedt a $250,000 mortgage on farmland in Calhoun County. On April 19, 1984, Fred gave a confession of judgment in favor of McCullough for $250,000 filed in Sac and Calhoun Counties. This confession of judgment and mortgage was given at a time when fees of less than $10,000 were due Mr. McCullough.

On November 30, 1981, less than one year prior to the date of the filing of the dissolution petition Goracke & Wilcox, P.C., certified public accountants prepared an unaudited statement showing the parties to have:

| | |
|---|---|
| Total assets | $1,467,236 |
| Total liabilities | 257,358 |
| Net worth | $1,907,669 |

After the first trial the master determined the parties to have:

| | |
|---|---|
| Total assets | $670,995.47 |
| Total liabilities | 144,403.05 |
| Net worth | $526,592.42 |

The master's determination did not recognize the confession of judgment given to McCullough and Bierstedt.

The difference between the November 1981 net worth and the master's determination of the parties' net worth is about $1,331,000. Fred contends the 1981 financial statement showed inflated figures and was prepared on the advice of some banker he could never identify. Fred also contends the value of the parties' assets has decreased because of current market conditions.

We recognize there is validity in both arguments and we give them credence. We note $450,000 of the $700,000 decrease in total assets between the November 1981 and December 1982 financial statements is clearly attributable to a $450,000 decrease in the estimated market value of fixed assets. Part of the decrease is related to a decrease in the value of capital stock in related corporations offset in part by an increase in loans receivable for related corporations. A determination as to whether this loss in value of capital stock of related corporations was the result of decrease in market value of corporate assets could only be made from a careful examination of corporate records. Fred made no effort to explain the decrease in net worth. Furthermore, a comparison of current personal liabilities on the two statements shows the current liabilities to have gone from $93,830 in November 1981 to $568,136 in December 1982. This increase occurred almost entirely because of new notes payable. This analysis points to the fact there is a large and unexplained decrease in the

net worth of the parties occurring near and during the time of the dissolution.

Assessing the parties' liabilities equally against the jointly held property, the trial court awarded Wilma a net amount of $200,000 in property and Fred a net amount of $326,800 in property.

In this appeal, Wilma contends the division is inequitable and asks that Fred be charged with marital assets which were under his care and charge when the dissolution was filed, are no longer available, and for which Fred is not able to account. Wilma contends she should be awarded all the assets because Fred has already transferred, concealed or encumbered his equitable share and has done so in violation of the trial court's injunctive order.

The record before us is substantially the record that was before us when our June 1986 decision was filed. We have examined the record that was made prior to our previous decision and are as convinced now as we were then that Fred transferred assets in violation of court orders and has never accounted for them and the marital estate has been substantially depleted because of his actions.

The evidence taken on remand further verifies our first decision. In addition to the evidence of Fred's conduct in the prior action the evidence on remand showed that Fred sold a lot in Taney County, Missouri, on July 31, 1985, and forged Wilma's name to the deed to sell. The amount received is not known nor was it accounted for. On July 9, 1985, Fred forged Wilma's name to borrow $74,000 on a home owned by the parties in Branson, Missouri. Fred made no accounting of the funds received from the loan. But on remand he amended his financial filings to show it as a liability. Fred borrowed money from his daughter Shirley Phillips in the amount of $28,096. No accounting for those funds is made. Fred obtained a loan from the Centerre Bank of Crane, Missouri, for $31,000 on May 28, 1985. To secure the loan he pledged Shepherd of the Hills stock held in his name. Again, no accounting of this money is made. Fred also borrowed $10,000 from a grandchild's trust.

The assets in question were under Fred's control and he exercised the management. We recognize this is the posture he maintained in the family structure. We recognize the substantial contribution Fred made to the marriage and the fact that during the marriage he was responsible for these businesses. We also recognize the substantial contribution Wilma made. Once the dissolution is filed Iowa law gives the court jurisdiction over all assets of the marriage. *See* Iowa Code § 598.21.

Understandably, there is a temptation for the parties to a dissolution to be less than fair with each other in the preservation of assets. This is particularly true when viewed in the context of the animosity and hostility that frequently accompanies the divorce process. We find considerable evidence that such hostility and animosity existed here.

 Both parties to a dissolution are required to disclose their financial status. *See* Iowa Code § 598.13; *In re Marriage of Mueller*, 400 N.W.2d 86, 88 (Iowa App. 1986). A party who has not been fair and accountable with property under his or her control during the dissolution process must be charged accordingly. To hold otherwise would in numerous instances weigh heavily against the marriage partner not in business. The courts of this state have an obligation to require accountability. Failure to disclose, secretion of assets, or transfer of assets during the dissolution process must be dealt with harshly. Otherwise the process becomes an uncivilized procedure and the issues become not ones of fairness and justice but which party can outmaneuver the other.

The Iowa courts have disapproved transfers which jeopardize the rights of the other spouse. Money given by a husband to a son by a prior marriage before the husband filed a dissolution petition was considered by the court in assessing his alimony obligation. *In re Marriage of Cerven*, 335 N.W.2d 143, 146–47 (Iowa 1983). In another case, the supreme court determined the trial court could not ignore the husband's unilateral post-separation disposition of marital assets, namely mortgaging real es-

tate and unauthorized disposition of proceeds. *In re Marriage of Johnson,* 350 N.W.2d 199, 202 (Iowa 1984).

In *Klingberg v. Klingberg,* 68 Ill.App.3d 513, 25 Ill.Dec. 246, 250, 386 N.E.2d 517, 521 (1979) the Illinois Court of Appeals remanded a case for the trial court's consideration where the husband withdrew a substantial portion of a savings account at the time he and his wife were separated. The court held it was a dissipation of marital assets and should be considered in the property settlement. In *Daniels v. Daniels,* 557 S.W.2d 702, 704 (Mo.Ct.App.1977), the Missouri Court of Appeals found a husband's withdrawal of $9,500 from a credit union two weeks before trial was an obvious ploy to defeat his wife's rights. The court said it should look through the transparent maneuver just as courts always disregard fraudulent conveyances employed to hinder and delay creditors. We consider Fred's transfer of nearly $500,000 in property, with no accounting or no plausible explanation, in assessing the property settlement.

Fred tries to justify the transfers by claiming they are in the regular course of doing business. We disagree. Fred admits he took money from the joint accounts and that he took the tax refund. He claims he used the $26,846.24 from Shepherd of the Hills to live on and claims in a statement void of any reference to supporting evidence in the record, *see* Iowa R.App.P. 14(b), that the $236,000 transfer to Verona Valley Farms, Inc., was not a loan but merely a bookkeeping entry. Fred's statement in his brief contradicts his answer to interrogatories wherein he attached a schedule showing the loans Wilma claimed were made to Verona Valley were made. He apparently claims the Weightronix stock did not have to be accounted for because Wilma made no request to have it accounted for and there was no order by separate documents requiring him to tell how much it was. We firmly reject these arguments. Fred responds to Wilma's accusation that he didn't account for the extensive sale of livestock, farm machinery and equipment from Verona Valley Farms by contending Wilma made the accusations without support. We find support in the record for Wilma's claim.

Fred's brief dismisses the sale of the lot by saying they believe the money was accounted for. We find no accounting of the money. The issue of the mortgage on the Branson house is refuted by claiming there already was a mortgage on it. The record is clear Fred forged Wilma's name on the mortgage. Fred's position is there is nothing in the record to support a finding Fred received money from the mortgage and confession of judgment given to McCullough and Bierstedt. Fred claims his actions are justified because Wilma had a salaried position. We have considered Fred's arguments but find they do not justify his actions.

III. Abuse of Discovery Process

Wilma next contends we should address Fred's abuse of the discovery process.

Fred's evasive and dishonest actions were not limited to transfers of property, mortgaging of property and forgeries; his attitude in this regard for fairness and accountability extended to the discovery process. Because, as discussed earlier, Fred had been in control of the business interests in Iowa and Missouri, Wilma entered the discovery process at a substantial disadvantage. Furthermore, Fred's attorney had information about his business from previous dealings. In an early motion Wilma sought to have Tom McCullough removed as attorney for Fred, claiming McCullough had represented both of them in their various business interests. The motion was successfully resisted by Fred who claimed he controlled the business interests and Wilma had had little contact with McCullough.

Wilma had to start from the beginning to locate and value marital assets and liabilities. Wilma filed extensive interrogatories and utilized other discovery procedures. Fred made no attempt whatsoever to offer his cooperation to implement the discovery process. Fred made numerous efforts to impede the process. Fred sought to be as evasive as possible in answering interroga-

tories and gave noncommittal, nebulous answers.

After the petition was filed and the injunction issued against concealing records, eight file drawers of business records were removed by Fred from the family home and taken to his attorney's office. When the records were requested by Wilma, Fred alleged he no longer had them. At trial, Fred admitted he did not refer to the records he took to McCullough's office in responding to any of the discovery requests.

Fred failed to produce certain other documents, particularly bank records. Ultimately the trial court ordered Fred to deliver all bank records in his possession, custody, or control or to personally file an affidavit that he did not have possession, custody or control of any bank records. Fred responded, "I have no such bank records or bank statements." He verified the answer. At the time of trial, Fred explained he did not have the records because they were in the possession of his certified public accountant.

Fred was not excused from answering the questions or providing the requested information simply because the materials were in the possession of his attorney or accountant. *See Hercules Inc. v. Exxon Corp.*, 434 F.Supp. 136, 158 (D.Del.1977) (party answering interrogatory ought to make a good faith effort, in keeping with previous experience, to obtain identification of documents held by third party).

A party's failure to comply with discovery defeats the purpose of discovery by reducing access of the moving party to relevant evidence and leaving the actual grounds of the controversy ill-defined prior to trial. *See Haumersen v. Ford Motor Co.*, 257 N.W.2d 7, 14 (Iowa 1977). Parties should promptly and fully comply with discovery rules. *Blink v. McNabb*, 287 N.W. 2d 596, 601 (Iowa 1980). The fact discovery may be burdensome to a party is not a sufficient reason to justify the party's refusal to answer an interrogatory. *Hercules Inc.*, 434 F.Supp. at 158.

Wilma also made a request under Iowa Rule of Civil Procedure 129 for entry into a residential property of the parties in Branson, Missouri. Fred was living there and Wilma believed certain unaccounted for personal property was in the house. When Wilma's attorney went to Branson to take depositions and to inspect the residence, he was denied entrance despite the notice of request for entry. The record made on remand verified Wilma's suspicions there were business records in the Missouri house. She had requested the records be produced; the existence of the records had been denied by Fred under oath. After Fred died his executor testified there were in the Missouri house, of which Fred had possession when he died, two desks, a suitcase, and a four-drawer file full of records.

Wilma filed eleven motions for sanctions. The trial court imposed no sanctions. Fred contends the discovery issue is being raised for the first time on appeal. Obviously the eleven motions for sanctions are before us. We recognize the problems overworked and understaffed trial judges face in attempting to find the necessary time to address discovery motions of this magnitude. The fact that the appellate courts of this state see few of these problems is a credit to the cooperation that generally exists among the Iowa bar in resolving discovery in accordance with the Iowa Code of Professional Responsibility EC 7–38 which provides:

A lawyer should be courteous to opposing counsel and should accede to reasonable requests regarding court proceedings, settings, continuances, waiver of procedural formalities, and similar matters which do not prejudice the rights of his client. He should follow local customs of courtesy or practice, unless he gives timely notice to opposing counsel of his intention not to do so. A lawyer should be punctual in fulfilling all professional commitments.

To tolerate unreasonable and unprofessional conduct might let others think our discovery rules can be flouted. *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778,

2781, 49 L.Ed.2d 747, 751 (1976). While we find it unnecessary to address the issue of sanctions, the displeasure we note here should be a warning that this court expects not only cooperation between attorneys on discovery matters but also expects attorneys licensed in this state to accept a responsibility to assure compliance with the dictates requiring full disclosure of assets in dissolution actions.

We consider Fred's conduct in the discovery process in assessing his credibility and in examining the issue of his responsibility for the loss of assets under his control during the pendency of this action. *See In re Marriage of Moffatt,* 279 N.W.2d 15, 17 (Iowa 1979).

### IV. Cross–Appeal

Fred cross-appeals contending he should have one-half of Wilma's civil service retirement. We agree with Fred that Wilma's pension should be considered in framing the financial clauses of this dissolution. *See In re Marriage of Bevers,* 326 N.W.2d 896, 900 (Iowa 1982); *In re Marriage of Yates,* 365 N.W.2d 49, 51 (Iowa App.1985). We consider the wife's as well as the husband's pension rights. *In re Marriage of Byall,* 353 N.W.2d 103, 106 (Iowa App.1984).

The pension plan was valued by the master at $14,897.78. Fred questions the value. We find it unnecessary to address that issue. Fred had paid into the social security system. Had he lived he would have qualified for substantial social security benefits. We are required to look at the consequences of his social security coverage. *In re Marriage of Schissel,* 292 N.W.2d 421, 427 (Iowa 1980). The presence or absence of social security benefits is a factor to consider in applying the analysis of *Schantz v. Schantz,* 163 N.W.2d 398, 405 (Iowa 1968). *See Locke v. Locke,* 263 N.W.2d 694, 696 (Iowa 1978). Because Wilma is under civil service she does not pay to social security. To consider her pension but to ignore Fred's social security would not be equitable. We consider the benefits that would have been available to each party on retirement to be fairly equal. We reject Fred's claim he should have a portion of Wilma's civil service pension. *See Byall,* 353 N.W.2d at 107.

We have considered the other issues raised in Fred's cross-appeal and find them to be without merit.

### V. Disposition

In making an equitable division of the parties' property, we consider transfers of assets in violation of court orders and discovery abuses in addition to the factors set out in Iowa Code section 598.21(1). We consider too that over $500,000 in assets which were under Fred's control at or near the time the dissolution was commenced have disappeared. *See Johnson,* 350 N.W. 2d at 202.

We order the decree should be modified to give Wilma all assets held in the name of either Fred or Wilma or both of them, including any interest Fred may have in a cause of action against Ned Stockdale and Gene Blackburn. We order Wilma to repay $10,000 to her grandson's trust. We order Wilma to pay all trial and appellate costs and the costs of the master.

We do not order Wilma to pay any other debts or encumbrances. In doing so we are aware Wilma continues to be obligated for debts she herself may have contracted and some of the property transferred to her is subject to liens and encumbrances. We cannot and do not limit obligations Wilma may already have to third parties.

There is litigation pending against McCullough and Bierstedt seeking to set aside the $250,000 mortgage and against McCullough seeking to set aside the $250,-000 confession of judgment. The merits of that litigation are not before us. Nor do we address the issue of an attorney taking a confession of judgment and mortgage from a client when there was an order restraining his client from making such a transfer. Whether McCullough violated the ethical code is not a proper matter for review in this action. *See Cornell v. Wunschel,* 408 N.W.2d 369, 376 (Iowa 1987).

In the event Wilma is successful in having the confession of judgment and mortgage set aside, then she shall pay to Fred's estate the amount of $50,000. The amount is less than the amount this court awarded

Fred in the prior decision. The amount is less because the record on remand showed additional assets under Fred's control had been depleted. Because Fred is dead we no longer consider his need for support. This sum shall be reduced by any costs, including fees to Wilma in setting the judgment aside. The $50,000 shall be paid $25,000 within six months of the time set aside and $25,000 within twelve months. Interest shall run on said amount at ten percent from the date it is set aside.

AFFIRMED AS MODIFIED.

HAYDEN, J., concurs.

DONIELSON, P.J., specially concurs.

HABHAB, J., takes no part.

DONIELSON, Judge (specially concurring).

I am in complete agreement with the majority opinion, but do wish to add my comments to the well-written and thoroughly-researched majority opinion.

The first order in the file was dated November 23, 1982, and contains a clear and unequivocal order stating in part:

IT IS FURTHER ORDERED that the Respondent Fred Williams, Jr., be and he is hereby restrained and enjoined during the pendency of this action from selling, assigning, transferring, conveying, encumbering, mortgaging or otherwise disposing of any property, real or personal, tangible or intangible, over which he has control, except in the ordinary course of a business which maintains complete and accurate written records of its transactions, without first providing written notice of any such transfer, encumbrance or conveyance to the court with a copy to Petitioner's attorneys at 142 North 9th Street, Fort Dodge, IA 50501, at least ten (10) days in advance of date of transfer, conveyance or encumbrance.

IT IS FURTHER ORDERED that the Respondent Fred Williams, Jr., be and he is hereby restrained and enjoined during the pendency of this action from destroying, altering or concealing any written or recorded record in his possession, custody or control pertaining or related to any business or property of Respondent, of Petitioner, or either of them, or of any entity, corporation, partnership or sole proprietorship in which Respondent has an actual or beneficial interest.

This order was thereafter reaffirmed on December 20, 1982, June 6, 1983, and May 29, 1984. There can be no mistake; not only was there a blatant, continuous violation of this order of the court, but there was no change in counsel, and present counsel continued his representation in the face of this clear and unequivocal order. When his client not only totally disregarded the order but violated it repeatedly, counsel aided and abetted him in doing so and thereafter even accepted a $250,000 mortgage on farmlands in Calhoun County and then took a $250,000 confession of judgment when the fees due the counsel were either less than $10,000 or, looking at the record, possibly nothing at this time.

Fred was candid in stating that the interest in the farm was transferred to his counsel to avoid his creditors. It would appear to me that legal counsel, as well as the client, has the responsibility of complying with the court orders clearly set forth. It is quite apparent to me that counsel for the deceased Fred Williams, Jr. has some grave responsibilities to account for his action in detail for his part in this debacle, not only for the $250,000 mortgage and confession of judgment, but for the other matters mentioned in the majority opinion as well.