IN THE COURT OF APPEALS OF IOWA

No. 15-0282
Filed April 27, 2016


IN RE THE MARRIAGE OF CHARLES RONALD PETERSEN
AND KAREN ELAINE PETERSEN

Upon the Petition of
**CHARLES RONALD PETERSEN,**
       Petitioner-Appellee/Cross-Appellant,

**And Concerning**
**KAREN ELAINE PETERSEN,**
       Respondent-Appellant/Cross-Appellee.
_____


       Appeal from the Iowa District Court for Pottawattamie County, James M.

Richardson, Judge.


       A wife appeals and a husband cross-appeals the economic provisions of

their dissolution decree. **AFFIRMED AS MODIFIED.**


       Shannon D. Simpson of Telpner, Petersen, Smith, Ruesch, Thomas

& Simpson, L.L.P., Council Bluffs, for appellant.

       Michael J. Winter, Council Bluffs, for appellee.


       Considered by Vogel, P.J., Doyle, J., and Scott, S.J.*

       *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**SCOTT, Senior Judge.**

Karen Petersen appeals and Charles Petersen cross-appeals the economic provisions of their dissolution decree. The parties agree the decree should be modified to incorporate their visitation agreement. We affirm the awards of child support and spousal support. We modify, however, to provide Karen will be responsible for one-third of the children's non-covered medical expenses and Charles will be responsible for two-thirds of the expenses. We modify the property division to increase the property settlement to Karen. Each party is responsible for his or her own appellate attorney fees.

### I.    Background Facts & Proceedings

Charles and Karen were married in 1996. They have two children, born in 1998 and 2000. The parties agreed to joint legal custody and joint physical care of the children.

In 1992, Charles created Petersen Cloverleaf Farms, Inc. (Cloverleaf), which has 17,917 shares, for the operation of his farming enterprise. Charles testified the shares had a fair market value of thirty dollars per share at the time of the marriage. He had total assets worth about $717,000 and Karen had assets worth about $15,000 when the parties married. During the marriage, Charles placed all of his premarital assets and most of the marital assets into Cloverleaf. Cloverleaf owned the parties' home, Charles's vehicle, the farm machinery, and much of the land farmed by Charles.

In 1995, Charles invested in Midwest Land Development, L.C. When the company was dissolved in 2006, Charles received $257,009. About $150,000 was used to purchase a farm, and the balance was used for expenses. The farm

was later sold for $278,000. In 2003 Charles created Dal-Dani, L.L.C. and placed certain assets in that corporation.

In 1997, Charles created the Charles R. Petersen Living Trust. The trust provided Charles "does hereby irrevocably assign, convey, transfer, and deliver to the Trustee all of Grantor's right, title, and interest in the property listed." The irrevocable living trust originally contained only life insurance policies, but beginning in 2007, Charles began placing shares of stock in Cloverleaf and Dal-Dani into it. According to the terms of the trust, Karen was the income beneficiary, so long as she was married to Charles and remained married to him at the time of his death. The parties' children would receive the principal and income from the trust once both Charles and Karen died. During the marriage no income from Cloverleaf and Dal-Dani went into the trust. Charles operated the companies as he saw fit and all of the income went to him.

Charles filed a petition for dissolution of marriage of March 4, 2014. The parties entered into a Mediation Agreement-Parenting Plan, which set out a visitation schedule and set certain guidelines for joint parenting of the children. The district court entered a temporary order requiring Charles to pay Karen $3000 per month in spousal support. He was also ordered to pay Karen $20,000 as an advance on the property settlement. The court entered an order enjoining the parties from dissipating marital assets. The order permitted Charles to take out a loan not to exceed $120,000 to make improvements to his residence.

At the time of the dissolution, the shares of Cloverleaf stock were worth ninety-five dollars per share, giving the company a total value of $1,702,115. Charles owned 8959 shares, worth $851,105; the children each owned 400

shares, worth a total of $76,000; and the trust owned 8158 shares, worth $775,010. The value of the stock in Dal-Dani was valued at $750,000, with Charles owning stock worth $345,000, and the trust holding stock worth $405,000. In total, the irrevocable living trust held shares valued at $1.18 million.

The dissolution hearing was held on January 13, 2015. At the time of the hearing, Charles was fifty-seven years old. He is currently self-employed as a farmer and has annual income of about $95,000. Karen was forty-eight years old. She has a college degree, but had not worked at a full-time job outside the home since 1998. She is currently employed as a part-time teacher at a Montessori school and has annual income of $15,080.

The district court issued a dissolution decree for the parties on January 22, 2015. The court awarded Karen spousal support of $3000 per month for fifteen years. Taking into consideration Charles's average income of $95,000 and Karen's income of $15,080 plus her spousal support of $36,000 per year, the court determined Charles should pay child support of $300 per month.

The court found the assets placed in the irrevocable living trust were not marital assets. The court also set aside to Charles the premarital value of the Cloverleaf shares he brought to the marriage, $268,770,[1] and $20,000, representing his initial investment in Midwest Land Development. The court determined the marital assets had a value of $1,363,335. The court awarded Karen the marital residence, $442,760; a vehicle, $28,000; personal items,

---

[1] At the time of the dissolution the shares were valued at ninety-five dollars per share. Charles testified the shares were worth thirty dollars per share at the time of the marriage. The court determined the marital portion of the value of shares was sixty-five dollars per share. The amount of $268,770 was thus set aside to Charles (8595 x $30 = $268,770).

$10,000; and recognized a court-ordered advance of $23,700, giving her assets of $504,460. The court ordered Charles to pay Karen $197,707 as an equalization payment, giving her a total of $702,167. Charles was awarded the remainder of the marital assets, worth $661,168. The parties were ordered to pay their own attorney fees.

Both parties filed motions pursuant to Iowa Rule of Civil Procedure 1.904(2). The court modified the decree to provide Charles would pay child support of $173 per month when only one child is eligible for support. The court also modified to provide when only one child was eligible as a tax exemption, the parties would alternate the exemption yearly, with Charles having the first year. In all other respects the parties' motions were denied. Karen appealed and Charles cross-appealed.

## II.    Standard of Review

Our review in dissolution cases is de novo. Iowa R. App. P. 6.907; *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). We examine the entire record and determine anew the issues properly presented. *In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). We give weight to the factual findings of the district court, but are not bound by them. *In re Marriage of Geil*, 509 N.W.2d 738, 741 (Iowa 1993).

## III.    Visitation

Karen claims the district court should have adopted the parties' visitation agreement and Charles agrees. On June 2, 2014, the parties entered into a Mediation Agreement-Parenting Plan, which set out a visitation schedule for holidays and summers. The district court did not specifically mention the

visitation schedule, but ordered, "The Mediation Agreement-Parenting Plan filed herein on 6/2/14 is incorporated by reference and decreed." To the extent there is any ambiguity on the issue, we modify the decree to adopt the parties' visitation agreement.

## IV.     Child Support

**A.**     Karen claims the district court improperly set the amount of Charles's child support obligation. The court found Charles's annual income was $95,000. She states child support should have been based on Charles's average annual income of $110,861.

A parent's current monthly income must be determined from the most reliable evidence presented. *In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991). "This often requires the court to carefully consider all of the circumstances relating to the parent's income." *Id.* Where a parent's income is subject to substantial fluctuations, the court may use an average of the parent's income. *In re Marriage of Knickerbocker*, 601 N.W.2d 48, 52 (Iowa 1999).

Charles states his average income from 2009 to 2013 was $112,819, but over the last three years, from 2011 to 2013, his average income was $87,237. Karen presented the testimony of James Watson, an attorney and certified public accountant, who testified Charles's five-year average income was $110,861. On our de novo review of the record, we find the district court properly determined Charles's income for purposes of calculating his child support obligation was $95,000 per year. The court's finding is supported by Charles's testimony his income was closer to $95,000 per year than the figure of $110,861 used by

Watson. Charles testified he believed $95,000 was a fair figure to use for child support purposes, although his average income over recent years was less.

Karen also claims the district court improperly imputed annual income of $50,000 to her. In determining Karen's income for child support purposes, the court used her income of $15,080 and added in the amount she will receive in spousal support, $36,000, to find she had annual income of about $50,000. The court may include the amount a parent receives in spousal support in determining the parent's income in calculating child support. *See In re Marriage of Lalone*, 469 N.W.2d 695, 697 (Iowa 1991); *see also In re Marriage of Allen*, 493 N.W.2d 273, 275 (Iowa Ct. App. 1992). For the purposes of calculating child support, we conclude the court properly found Karen's annual income was $50,000.

**B.** Karen claims the district court should have deviated from the amount of child support set by the child support guidelines because Charles had unfettered access to discretionary withdrawals from Cloverleaf and Dal-Dani. Iowa Court Rule 9.11 provides:

> The court shall not vary from the amount of child support that would result from application of the guidelines without a written finding that the guidelines would be unjust or inappropriate as determined under the following criteria:
> 9.11(1)    Substantial injustice would result to the payor, payee, or child(ren).
> 9.11(2)    Adjustments are necessary to provide for the needs of the child(ren) or to do justice between the parties, payor, or payee under the special circumstances of the case.

Karen relies upon the case of *In re Marriage of Will*, 602 N.W.2d 202, 205 (Iowa Ct. App. 1999), where a father had gifted certain assets to his current wife and she received interest income. We determined the interest income was not

part of the father's net monthly income as defined by the guidelines, but was a factor to be considered in determining whether a deviation from the guideline amounts was justified. *Will*, 602 N.W.2d at 205. Karen claims the situation is similar in this case and the income earned by Cloverleaf and Dal-Dani should be considered in determining whether there should be an upward deviation from the guidelines.

Frank Pechacek, an attorney, testified Charles received all of the income from the corporations; none of it went to the irrevocable living trust. Pechacek stated all of the income from the corporations was reported on the parties' income tax returns. Thus, this income has already been considered in finding Charles earned $95,000 per year. There was also evidence Charles took loans from the corporations, which were supported by promissory notes. We determine the loans should not be considered as income to Charles. We conclude the evidence does not support an upward deviation from the child support guidelines. We affirm the child support provisions in the dissolution decree.

**C.** Karen claims the district court improperly ordered her to pay two-thirds of the children's uncovered medical expenses. Under the terms of the dissolution decree, Charles is required to provide health insurance for the children. The decree provides, "[Karen] shall be responsible for and hold [Charles] harmless from two-thirds (2/3) of any non—covered doctor, eye, hospital, drug, or dental expense incurred by a child he is obligated to pay support."

Iowa Court Rule 9.12(5) provides, "In cases of joint physical care, the parents shall share all uncovered medical expenses in proportion to their respective net incomes." The court found Charles had net monthly income of $5598.31 and Karen had net monthly income of $3184.11. Using these amounts, we determine the decree should be modified to provide Charles should pay two-thirds of all uncovered medical expenses and Karen is responsible for one-third of these expenses.

### V.      Spousal Support

Karen claims the amount of spousal support awarded to her is not sufficient. She states she should be awarded traditional spousal support, which would be payable until she remarries or either of the parties dies, whichever occurs first, rather than for a period of only fifteen years. She also states the amount of spousal support should be increased to $4000 per month while Charles is obligated to pay child support and $5500 per month thereafter. Her claims are based on the marital standard of living, her needs, and Charles's ability to pay. In his cross-appeal, Charles states the amount of $3000 per month is equitable, but claims the amount should be payable for only five years. He states Karen should be able to become self-supporting at a standard reasonably comparable to that enjoyed during the marriage within five years.

"Property division and alimony should be considered together in evaluating their individual sufficiency." *In re Marriage of Trickey*, 589 N.W.2d 753, 756 (Iowa Ct. App. 1998). Spousal support is not an absolute right. *In re Marriage of Fleener*, 247 N.W.2d 219, 220 (Iowa 1976). Whether spousal support is proper depends on the facts and circumstances of each case. *In re*

*Marriage of Brown*, 487 N.W.2d 331, 334 (Iowa 1992). When determining whether spousal support is appropriate we consider the relevant factors found in Iowa Code section 598.21A (2013). *In re Marriage of Hansen*, 733 N.W.2d 683, 704 (Iowa 2007).

The district court ordered Charles to pay spousal support of $3000 per month for fifteen years, "unless said support shall sooner terminate in the event said [Karen] remarries or becomes deceased." With the receipt of spousal support, Karen will have annual income of $51,080. Subtracting his spousal support obligation of $36,000 per year from his annual income of $95,000 per year, leaves Charles with annual income of $59,000. We conclude the amount of spousal support is equitable. We also find the duration of the spousal support award, fifteen years, is equitable under the facts of this case. Karen will receive spousal support until she is sixty-three years old, which the district court found was a reasonable retirement age. We affirm the district court's award of spousal support.

### VI.  Property Division

### A.  Extent of the Marital Estate

1.  Karen claims the district court should have included the property placed in the irrevocable living trust in the marital estate because Charles's action of placing assets into the trust constituted dissipation of marital assets. The district court stated, "This Court specifically finds that the shares owned by the trust are not marital assets."

A party's dissipation of assets may be considered by a court in dividing marital property. *In re Marriage of Burgess*, 568 N.W.2d 827, 828 (Iowa Ct. App.

1997). "The dissipation doctrine applies when a spouse's conduct during the period of separation 'results in the loss or disposal of property otherwise subject to division at the time of divorce.'" *In re Marriage of Kimbro*, 826 N.W.2d 696, 700-01 (Iowa 2013) (citation omitted). The court first considers whether the alleged purpose of the expenditure is supported by the evidence. *Fennelly*, 737 N.W.2d at 104. This is an evidentiary matter. *Id.*

We examine whether Charles's alleged purpose for putting assets into the irrevocable living trust is supported by the evidence. Charles testified he transferred assets into the trust as part of his estate plan, so his children would receive the assets. He states he started transferring stock from Cloverleaf and Dal-Dani in 2007 because "then we had enough assets to start transferring money to the trust." Karen claims Charles placed the stock into the trust so it would not be available for division in a dissolution of marriage. She testified the parties began having marital problems in 2007. There was evidence Charles contacted an attorney in 2008 about getting a divorce. He filed petitions for dissolution of marriage in 2011 and 2012, which were subsequently dismissed, prior to the petition in this case in 2014.

Karen's expert, Watson, testified the formalities of the trust had not been maintained. As an income beneficiary, Karen should have received notice of gifts to the trust. Also, the trustee should have acknowledged receipt of gifts made to the trust. Furthermore, no tax returns were filed by the trust. Watson testified he believed the trust was valid as an Irrevocable Life Insurance Trust, as it was created as a trust to hold life insurance policies. He stated, however, it was not valid for the purpose of holding the shares of stock.

We note, although the trust owned 45.5% of Cloverleaf and 54% of Dal-Dani, Charles maintained complete control of both corporations and received all of the income from the corporations. This inconsistency, as well as the lack of formalities in the operation of the trust, leads to the conclusion the trust was not being used as a valid part of Charles's estate plan, but rather was a convenient entity to hold assets where Charles could still control the assets but they would be outside the marital estate. We determine the first element of a dissipation claim has been met. *See Fennelly*, 737 N.W.2d at 104 (noting the first element is whether the alleged purpose of the expenditure is supported by the evidence).

If the first element is satisfied, then the court considers whether the party's purpose amounts to dissipation under the circumstances of the case. *Id.* On this issue the court considers:

> (1) the proximity of the expenditure to the parties' separation, (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage, (3) whether the expenditure benefited the "joint" marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and the amount of, the expenditure.

*Id.* at 104-05. Another factor to consider is whether the party intended to hide, deplete, or diverge the marital asset. *Id.* at 105. "Failure to disclose, secretion of assets, or transfer of assets during the dissolution process must be dealt with harshly." *In re Marriage of Williams*, 421 N.W.2d 160, 164 (Iowa Ct. App. 1988).

Charles began transferring shares of stock to the irrevocable living trust in 2007. Karen testified the parties began having marital problems in 2007. There was evidence Charles contacted an attorney in 2008 about seeking a divorce, but did not file a petition at that time. The transfer of stock to the trust, beginning

in 2007, was not typical. Prior to 2007, the trust held two life insurance policies, which had been placed in the trust when it was created in 1997. The transfers of stock to the trust did not benefit the joint marital enterprise. The transfers benefitted Charles because it placed the stock outside the reach of Karen, with no detriment to Charles because he continued to operate the corporations. Additionally, there is no evidence in the record showing the need to place shares valued at $1.18 million in the irrevocable living trust. We conclude the evidence shows Charles dissipated marital assets by placing them in the trust.

Our conclusion is supported by a finding the transfers of stock to the irrevocable living trust were sham transactions. In the case *In re Marriage of Cerven*, 335 N.W.2d 143, 145 (Iowa 1983), a husband, who was obligated to pay his wife's nursing home expenses, transferred the bulk of his assets to his children. As here, the husband testified he wanted his children to receive his assets. *See Cerven*, 335 N.W.2d at 145. The Iowa Supreme Court recognized, while it was not improper "to desire the bulk of one's estate to go to one's children," "this desire is improper when the inter vivos transfer is made in an attempt to escape one's support obligations." *Id.* at 146. The court concluded the transfer "was merely a *sham gift* made in an attempt to shield [the husband's] assets from his present and future support obligations. *Id.* (emphasis added). In reviewing the property settlement, the court considered the assets the husband would have had but for the transfer to his children. *Id.*

Also, in the case *In re Marriage of Goodwin*, 606 N.W.2d 315, 321 (Iowa 2000), a wife transferred title to a vehicle to the parties' adult daughter. The Iowa Supreme Court determined the transfer of the vehicle was a sham transaction,

noting the daughter did not pay for the vehicle or take possession of it. *Goodwin*, 606 N.W.2d at 322. The supreme court determined, "These circumstances indicate that the transfer was in form only; title to the vehicle has changed, but possession, or the ability to possess, remains with [the wife]." *Id.* The court concluded the vehicle was properly included in the division of the parties' property. *Id.*

The evidence in the present case shows Charles's transfers of stock to the irrevocable living trust were sham transactions. As noted above, although the trust owned 45.5% of Cloverleaf and 54% of Dal-Dani, Charles maintained complete control of both corporations. Furthermore, he received all of the income from the corporations, and the trust received none of the income. We conclude the transfers to the trust were in form only. *See id.* Charles continued to operate the corporations as if he maintained possession of all of the stock. The proper remedy in the case of a sham transaction by a spouse is to include the property within the marital estate. *See id.*; *Cerven*, 335 N.W.2d at 146.

We determine Charles intended to deplete the marital estate in order to reduce the amount of property Karen would receive in a division of marital assets. We conclude the value of the stock in Cloverleaf and Dal-Dani which was transferred by Charles to the irrevocable living trust should be included in the value of the marital estate.[2]

---

[2] Karen also raises a claim Charles improperly transferred gifts to the trust on August 4, 2014, after the court had entered an order on June 19, 2014, prohibiting the parties from transferring assets, except for funds expended in the ordinary course of business. Because we have determined all of the stock held in the irrevocable living trust should be considered marital assets, we do not address this separate claim.

2.     Karen claims Charles dissipated marital assets by borrowing funds to improve his residence, which did not result in an increase in the value of the residence. The district court found the net equity in the home was zero, and awarded the home to Charles. The evidence supports a finding there was no net equity in the home.

3.     Karen also claims the district court improperly set aside to Charles the premarital value of Cloverleaf, $268,770, and $20,000, representing his initial investment in Midwest Land Development. "All property of the marriage that exists at the time of the divorce, other than gifts and inheritances to one spouse, is divisible property." *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). The marital estate includes not only property acquired during the marriage, "but property owned prior to the marriage by a party." *Id.* "The trial court may place different degrees of weight on the premarital status of property, but it may not separate the asset from the divisible estate and automatically award it to the spouse that owned the property prior to the marriage." *Id.*

At the time of the marriage, Charles had total assets worth about $717,000 and Karen had assets worth about $15,000, and thus Charles brought to the marriage assets worth $702,000 more than Karen. Considering this difference, his alimony obligation, the length of the marriage, the need to keep his business viable and all other factors in the case, equity requires Charles receive $350,000 more in property than Karen.

4.     Karen furthermore claims the district court did not account for all of the assets owned by the parties. She claims the court failed to include (1) a dividend from Southeast Iowa Renewable Energy stock, $6000; (2) Berkshire B

stock, $7500; (3) land, $72,731; and (4) checking accounts, $12,000 and $7795. Charles stated these assets either no longer existed or were already included in the assets divided by the district court. Karen states the court also improperly excluded certain debts. She states Charles had credit card debt of $22,356 at the time of the dissolution decree, while she had credit card debt of about $18,732. The district court determined Karen would be responsible for any credit card indebtedness in her name, and Charles would be responsible for all other marital debt.

We make no further adjustment to the parties' net worth based on the alleged additional assets or the parties' credit card debt.

5.     We conclude the extent of the marital estate includes the property as set forth by the district court, plus the amount held by the irrevocable living trust, plus the amount set aside to Charles as premarital property.

### B.     Value of Marital Assets

Karen claims the district court improperly valued the assets in the marital estate. She states the court undervalued the stock in Cloverleaf, the stock in Dal-Dani, the marital residence, and Charles's farmhouse. She asserts the net value of the marital estate is actually about $5,146,000.

On appeal, we refuse to disturb the district court's valuation of assets when they are within the range of permissible evidence. *In re Marriage of McDermott*, 827 N.W.2d 671, 679 (Iowa 2013). "Although our review is de novo, we ordinarily defer to the trial court when valuations are accompanied by supporting credibility findings or corroborating evidence." *Hansen*, 733 N.W.2d at 703.

We determine the district court's valuations are within the range of permissible evidence. We conclude the value of the marital estate includes the property as set forth by the district court, $1,363,335, plus the amount held by the irrevocable living trust, $1,180,010, plus the amount set aside to Charles as premarital property, $288,770, making the total amount of the marital estate $2,832,115. We note this amount is close to the amount found in Charles's affidavit of financial status, where he lists the parties' total net worth as $2,638,355.

### C.    Division of Marital Property

The district court awarded Karen assets of $504,460, and ordered Charles to pay Karen $197,707 as an equalization payment, giving her a total of $702,167. We have determined the marital estate is worth $2,832,115, rather than $1,363,335, as found by the district court. Considering the assets each party brought to the marriage, we determine Charles should receive more than Karen in the property division. We modify the decree to increase the equalization payment to Karen to $736,000. This will give her a total of $1,240,460. Charles is awarded the remainder of the marital assets, worth $1,591,655.

### VII.    Attorney Fees

Karen claims the district court should have awarded her trial attorney fees. We review a district court's decision on whether to award trial attorney fees for an abuse of discretion. *Sullins*, 715 N.W.2d at 255. Considering the amount of property available to each party, we conclude the district court did not abuse its discretion in ordering each party to pay their own trial attorney fees.

Karen also requests attorney fees for this appeal. We consider the needs of the party seeking appellate attorney fees, the ability of the other party to pay, and the relative merits of the appeal. *Id.* After considering the facts of the case, we decline to award appellate attorney fees.

**VIII.   Summary**

We have modified the parties' dissolution decree to incorporate the visitation schedule found in the Mediation Agreement-Parenting Plan. We also modified the decree to provide Charles should pay two-thirds of all uncovered medical expenses and Karen is responsible for one-third of these expenses. Additionally, we have modified to increase the equalization payment to Karen to $736,000. In all other respects we affirm the dissolution decree. We do not award appellate attorney fees. Costs of this appeal are assessed one-half to each party.

**AFFIRMED AS MODIFIED**.