**In re the MARRIAGE OF Jon Ronald BEVERS and Betty Anne Bevers.**

**Upon the Petition of Jon Ronald Bevers, Appellee,**

**And Concerning Betty Anne Bevers, Appellant.**

No. 67611.

Supreme Court of Iowa.

Nov. 24, 1982.

T. Todd Becker, and Tom Riley, Cedar Rapids, for appellant.

Timothy S. White and Douglas C. Meyer of White & Warbasse, P.C., Cedar Rapids, for appellee.

Considered by LeGRAND, P.J., and UH-LENHOPP, HARRIS, McCORMICK and McGIVERIN, JJ.

McGIVERIN, Justice.

This is an appeal from the child custody and economic provisions of a dissolution decree in which petitioner Jon Ronald Bevers (Ron) was awarded custody of the parties' minor daughter, Brenda Anne. Respondent Betty Anne Bevers appeals.

We reverse in part and affirm in part.

The following issues have been raised for our consideration:

(1) whether the trial court erred in awarding child custody to Ron;

(2) whether alimony and child support should be awarded;

(3) whether the trial court erred in dividing the marital property.

In addition, we must determine the sanction for Ron's contempt of our order that neither party attempt to alienate Brenda from the other party during the pendency of this appeal.

Ron and Betty were married in Salt Lake City, Utah, on October 17, 1970. Ron had been married before and the three children from his previous marriage were in his custody. The little girl whose custody is at issue here, Brenda Anne Bevers, was born on July 27, 1972.

On August 26, 1980, Ron filed a petition for the dissolution of their marriage. The dissolution proceedings have followed the same stormy course as did the parties' marriage. On five occasions Ron sought court orders to allow visitation with his daughter. Betty also sought a court order to allow her visitation. After a long and bitter trial, the trial court, adopting the recommendations of the child's attorney, awarded custody to the father.

Thereafter, both parties also were found in contempt of court. After Betty appealed the dissolution decree, we found Ron in contempt for attempting to alienate Brenda from her mother in violation of our stay order as to custody. The sanction for this contempt will be decided with this appeal. Betty and her attorney, Tom Riley, were found in contempt by the district court for failing to turn the child over to her father after he was awarded custody of her and before we granted the stay order. We granted certiorari to review that contempt matter and also decide that case today. See *Bevers v. Kilburg,* 326 N.W.2d 902 (Iowa 1982).

Marital harmony eluded Ron and Betty from the beginning. It would serve no useful purpose to air fully the family's difficulties in this opinion, particularly since it is in the child's best interest that her parents cooperate in the future. Suffice it to say that the parties' conduct toward each other was not commendable. While Ron vented his anger and frustration by striking Betty and punching holes in walls, Betty withdrew into silence and frequently fled to her parents' home in Denver, Colorado. The parties, however, did manage to confine their arguments to times when the children were not present. The couple's marital problems were exacerbated by frequent moves due to Ron's climb up the corporate ladder of his employer, J.C. Penney Co. In May 1971 Ron was transferred to Omaha, Nebraska; in April 1974 Ron was promoted to store manager in Columbus, Indiana; and in April 1978 Ron was transferred to Cedar Rapids, Iowa, where he resided at the time this dissolution action was commenced. In February 1980 Betty and Brenda left Cedar Rapids for Denver, Colorado, where both continue to live.

Our review of this equity action is de novo. Iowa R.App.P. 4. We give weight to the fact findings of the trial court, but are not bound by them. Iowa R.App.P. 14(f)(7).

■ I. *Custody and visitation.* Character assassination was the game plan at the three week trial; yet the trial court recognized that "either parent is quite capable of providing parenting skills for [Brenda]." Custody was awarded to Ron for the following reasons: (1) Ron would be more willing to provide access of the child to the mother; (2) Brenda would be closer to her half-siblings if she were with her father;[1] (3) Ron is best able to discipline Brenda and his personality most closely matches hers; (4) Ron has a home in Cedar Rapids, while at present Betty and Brenda are living in Denver with Betty's parents; and (5) during an in camera meeting with the court Brenda, then age nine years and one month, expressed a desire to remain in Cedar Rapids.

---

1. Ron's three older children, now ages 22, 21, and 20, are living in the Cedar Rapids area.

After a de novo review of the record of trial testimony and accompanying exhibits, in light of the factors discussed in *In Re Marriage of Winter,* 223 N.W.2d 165, 166–67 (Iowa 1974), we disagree with trial court's award of custody of Brenda to Ron.

In child custody cases the first and governing consideration is the best interests of the child. Iowa R.App.P. 14(f)(15); *In Re Marriage of Winter,* 223 N.W.2d at 166. We do not believe that Brenda's long-range, best interests will be served by granting Ron custody of her. Ron testified that he resented the amount of time Betty spent with Brenda; he expressed a desire that as Brenda got older proper care could be found for her so that he and Betty "could get away." When Brenda was a baby and young child, Ron insisted that she be fed and put down for a nap before he came home from work. When Brenda was older, if she would come into the room where Ron and Betty were sitting after he came home from work, Ron testified that he "would get pretty upset and say: 'Brenda, just get out of here and leave us alone, I want to talk to your mother, go to your room, or something.'"

Betty became pregnant in the fall of 1979 and Ron was extremely upset. Not only did he feel that a new baby "would simply be [a] further burden and a further burr under the saddle," but he felt he was too old to have another child—he would have been sixty-four by the time the child left home.[2] Furthermore, Ron insisted that if Betty chose to keep the baby, instead of having an abortion, she and Brenda would have to leave the house. When it became clear that Betty was ready to leave, Ron told Brenda that if she and her mother left, she would rarely, if ever, see her father or half-siblings again. Brenda's agitated state persuaded Betty to stay. While Betty agonized over the decision of whether to have an abortion, Ron flew off to the Bahamas

for a vacation and refused to give Betty a phone number at which he could be contacted. Betty relented and had an abortion, but before Ron returned from the Bahamas she and Brenda had left for Denver. Ron contacted Betty shortly after they arrived in Denver and threatened to sue for custody if Betty did not agree to his terms. She did not agree, but in May 1980 she and Brenda returned to Cedar Rapids only to flee back to Denver in August.

Although we agree with the trial court that Ron possesses the necessary parenting skills to care for Brenda, there is not a preponderance of evidence in his favor to allow him custody. We cannot ignore the fact that despite his love for Brenda, he has expressed ulterior motives in seeking custody of her.[3] The factors set forth in *In Re Marriage of Winter* are only considerations for a court to weigh. The ultimate determination as to custody must rest upon the best interests of the child, and those best interests will be founded upon the peculiar facts of each case. *In Re Marriage of Burham,* 283 N.W.2d 269, 274 (Iowa 1979); *see In Re Marriage of Mikelson,* 299 N.W.2d 670, 674 (Iowa 1980) (children's preference given little weight in view of children's ages, eleven and ten, and parental influences on their decision).

We find that Ron's motives do not further the best interests of Brenda. Also, we note that Betty has been the primary parent to see to Brenda's routine needs. Brenda has excelled in school both academically and socially while living with her mother in Denver. Brenda is now ten years old. A child should not be forced to undertake a nomadic existence for the sake of the parents. Custody should be fixed quickly and thereafter should not be disturbed needlessly. *In Re Marriage of Steenhoek,* 305 N.W.2d 448, 454 (Iowa 1981). Therefore, we reverse the trial court decision and award custody of Brenda to Betty.

**2.** Apparently he did not consider age a factor in seeking custody of Brenda who would have been seven years older than the baby.

**3.** We note also that the impression of the psychiatrist who examined Ron and Betty was that

Ron was seeking custody because he desired revenge and realized that the custody battle could be a bargaining chip in terms of the total marital settlement.

In regard to visitation, we hold that Ron has the right to have Brenda with him in Cedar Rapids, or wherever he resides, for alternately, all of her Thanksgiving vacation or one week of her Christmas vacation, said week to include Christmas Eve and Christmas Day. These holidays shall be alternated on a yearly basis commencing with Christmas of 1982, which shall be spent with Ron. Thanksgiving of 1983 shall be spent with Ron, Christmas of 1983 shall be spent with Betty, and so forth. Additionally, Ron's visitation rights include the full period of any spring or Easter vacation Brenda might have from school, and a four-week period during her summer vacation commencing no earlier than one week after the last day of school and ending no later than two weeks prior to the start of a new school year. The transportation of Brenda shall be at Ron's expense, and such visitations shall not affect his duty to pay child support. See division III. Ron also shall have visitation in Denver, Colorado, or wherever Brenda resides, on alternate weekends from 9:00 a.m. on Saturday to 5:00 p.m. on Sunday commencing the weekend of December 10, 1982. If Ron is unable to visit Brenda on these weekends, he shall be permitted to telephone her at her home.

This visitation schedule does not prohibit additional visits as may be mutually agreed upon by the parties; however, at all times the best interests of Brenda must be foremost and no visitation schedule may be unduly disruptive. *In Re Marriage of Guyer,* 238 N.W.2d 794, 797 (Iowa 1976). It is in Brenda's best interest that the parties set aside their animosity toward one another and make good faith efforts to cooperate. Such cooperation entails that neither party say or do anything which would tend to alienate Brenda from the other party, and that the visitation and custodial rights of each parent not be interferred with. We do not favor parents who use their children as pawns in their marital battles.

II. *Property division.* The bulk of the couple's assets consisted of two cars, a $130,000 house with $43,400 in equity, Ron's J.C. Penney pension fund, worth $24,000 at the time of trial, and household goods and furnishings. However, the parties had accumulated a joint marital debt of approximately $18,000. Also, they decimated their remaining assets by incurring extensive attorney fees and expenses in connection with this prolonged, bitter dissolution case and the contempt cases. In addition, both parties have incurred sizeable personal debts after their final separation.

The court awarded Betty a car worth $6800, household items and a $20,000 lien against the house; $2500 of the lien amount represented the present value of Betty's interest in Ron's pension fund. This was payable at $5000 per year at 12% interest. Betty now lives with her parents in Denver and was unemployed at the time of trial; she had turned down an offer from J.C. Penney to return to a position similar to the one she had held prior to her marriage—manager trainee.[4] Ron was awarded second car which was valued at $5500, household items, an undivided interest in his pension fund and the house which was encumbered by a $75,000 mortgage. Ron also was ordered to assume the full amount of the joint marital debt. With his bonus, Ron's 1981 gross income was approximately $60,000, but his financial statement indicates that his actual expenses exceed his gross yearly salary of $41,129.04.[5]

We consider this issue in light of Iowa Code section 598.21 (1981) and the criteria set forth in *Schantz v. Schantz,* 163 N.W.2d 398, 405 (Iowa 1968); however, fault for the breakdown of the marriage is not a factor. *In Re Marriage of Williams,* 199 N.W.2d 339, 344–46 (Iowa 1972).

■ Betty contends that the trial court erred in considering Ron's pension fund as

---

4. There is evidence in an affidavit filed in the post-trial contempt proceeding that Betty is now employed as a workshop assistant at the Community College of Denver from 9:00 a.m. to 3:00 p.m.

5. Whatever bonus Ron may receive is based on a point system dealing with store profit, percentage increase in profits and sales, and several other factors.

an asset brought into the marriage, or alternatively, that the trial court erred in valuing Betty's share. Although Ron testified that at the time of the parties' marriage the fund was "borrowed out," no evidence was presented as to the fund's actual value, if any, at the time of the parties' marriage. At the time of the trial the fund amounted to $24,000, only $10,524 of which had accumulated during the period of the marriage.

We conclude that the trial court correctly included Ron's pension fund as an asset brought into the marriage by him. Pension benefits are deferred compensation; rights to the pension benefits are derived from the employment contract and a contractual right is a chose in action—a form of property. *Hunt v. Hunt,* 78 Ill.App.3d 653, 658–59, 34 Ill.Dec. 55, 60, 397 N.E.2d 511, 516 (1979); *In Re Marriage of Brown,* 15 Cal.3d 838, 845, 544 P.2d 561, 563, 126 Cal.Rptr. 633, 637 (1976). At trial, Betty presented no evidence as to how her interest in the pension fund should have been valued. The trial court discounted the amount of pension fund accumulated during the marriage to its present value and awarded Betty $2500 as her present interest. The effect of the trial court's decree was to award Betty her present property rights in terms of "real" assets—a lien on the house. Ron, on the other hand, received a mere "expectancy"—retirement benefits *if* all of the contingencies specified by his plan are satisfied. *See* Hardie, *Pay Now or Later: Alternatives in the Disposition of Retirement Benefits on Divorce,* 53 Cal.St.B.J. 106, 110 (1978). We find that the division of the parties' interests in the pension fund was reasonable and equitable under this record.

■ Betty also contends that the trial court erred in dividing the equity in the parties' house, and that the homestead should have been ordered sold. In view of the present economic situation in the housing market, the parties' individual circumstances, and the remainder of the property division, we find that the trial court's division of the equity in the house was reasonable and equitable, and in accordance with

section 598.21. We affirm the trial court's division of the marital property in all respects except one. The lump sum award and judgment lien on the house in favor of Betty of $20,000 shall collect interest at the rate of 12% per annum and shall be paid as follows: the principal sum of $5000.00 plus interest is to be paid each year for four consecutive years, following issuance of procedendo, commencing June 1, 1983, and each year thereafter until paid in full.

■ III. *Alimony and child support.* The trial court did not award Betty alimony, in part, because she would be receiving lump sum payments pursuant to the property division. We agree with Betty that the court erred in that regard. However, we agree with the trial court's findings that Betty's living expenses in the home of her parents are nominal and that she "has a college education, is physically capable of employment and is an intelligent person capable of gaining employment, although not necessarily in the area of her choice without further training."

■ The payment of alimony is not an absolute right; it must be determined in light of all circumstances, including the property settlement. *In Re Marriage of McFarland,* 239 N.W.2d 175, 179 (Iowa 1976). We realize that Betty was out of the job market for the duration of her marriage and may need further training. On the other hand, since she has the demonstrated ability to be successfully employed and was offered a job by J.C. Penney Co. in Denver which she declined, it is not necessary that Ron contribute to her support indefinitely. Therefore, we hold that Betty is entitled to rehabilitative alimony in the sum of $200 per month for a period of two years commencing January 1, 1983.

Betty also requests that Ron be ordered to pay child support. Ron acknowledges his continuing obligation to support Brenda if Betty is awarded custody. *Yansky v. Yansky,* 172 N.W.2d 114, 117 (Iowa 1969). In our December 1, 1981, order staying the custody provisions of the district court decree, we ordered Ron to pay $100 per week temporary child support. We direct Ron to

continue paying as child support $100 per week to the clerk of the Linn County district court until Brenda reaches the age of eighteen, is self-supporting or married, whichever occurs first. Ron shall continue this support if Brenda, between the ages of eighteen and twenty-two, is unmarried and meets the conditions of Iowa Code section 598.1(2) (1981), as to acceptance and attendance at educational institutions. *In Re Marriage of Williams,* 303 N.W.2d 160, 166 (Iowa 1981).

**IV.** *Attorney fees.* In the trial court an attorney for Brenda was appointed under Iowa Code section 598.12 (1981). Betty asserts that the trial court erred in its allocation of payment of fees for the attorney for Brenda. Ron was ordered to pay $6000 and Betty was ordered to pay $3850 of the remaining $9850 in fees allowed the child's attorney.[6] We believe the district court considered the entire economic situation of the parties in ordering Betty to pay part of the fees of Brenda's attorney. We give weight to the trial court findings and conclude the award and allocation were justified and should not be altered. *In Re Marriage of Beeh,* 214 N.W.2d 170, 176 (Iowa 1974).

**V.** *Contempt sanction.* On December 1, 1981, we stayed the custody provisions of the district court decree. We further ordered that "[n]either party shall do or say anything that would alienate Brenda from the other party during the pendency of this appeal." Thereafter, one evening in Denver, Betty observed Brenda become very distressed while talking to her father on the phone. By monitoring Ron's telephone calls to Brenda, Betty discovered that he was attempting to persuade Brenda to talk her mother into dropping her fight for custody.[7] Upon Betty's application, a rule to show cause was issued by this court. After hearing, we found that Ron had willfully and deliberately sought to alienate Brenda from her mother through psycho-

logical manipulation. We held him in contempt of our December 1, 1981, order, subject to a sanction provided in Iowa Code section 665.4(1) (1981). The issue of the appropriate sanction was submitted with this appeal.

In punishing for contempt we are mindful that the exercise is a delicate one, and that arbitrary or oppressive conclusions must be avoided. *Knox v. Municipal Court of the City of Des Moines,* 185 N.W.2d 705, 707 (Iowa 1971). We are aware of the pressures felt by petitioner to retain the custody of his little girl which he had won after a long, bitter and costly court battle. Nonetheless, we cannot condone the psychological warfare employed by Ron, especially in light of our specific order which prohibited such actions. We hold that petitioner's contempt of our order is punishable by a fine of $300, payable to the clerk of our court, and it is so adjudged.

Respondent Betty Anne Bevers has filed an application for appellate attorney fees. We hereby deny her application.

In summary, we reverse in part and affirm in part the decree of the district court.

Costs in this court are taxed two-thirds to Ron and one-third to Betty.

REVERSED IN PART; AND AFFIRMED IN PART.

---

6. The trial court also ordered Ron to pay $5000 of Betty's attorney fees. This was not appealed.

7. Betty made a tape recording of three subsequent phone calls. Ron's counsel admitted that the transcription of these tapes, although not complete, was accurate.