In re MARRIAGE OF Jean Marie
CROSBY and Clayton
Crosby, Jr.

Upon the Petition of Jean Marie
Crosby, Appellee,

and

Concerning Clayton Crosby,
Jr., Appellant.

No. 03–1919.

Supreme Court of Iowa.

July 1, 2005.

256

Joseph G. Bertogli, Des Moines, for appellant.

Patrick H. Payton of Patrick H. Payton & Associates, P.C., Des Moines, for appellee.

LARSON, Justice.

The respondent in this case, Clayton Crosby, appeals from a property division in the decree of dissolution of the marriage between Clayton and his wife, Jean. The court of appeals modified and affirmed the decree. We vacate the decision of the court of appeals, affirm and modify the decree, and remand.

## I. *Facts and Prior Proceedings.*

In September 2002 Jean Crosby filed a petition for dissolution, following an eleven-year marriage to Clayton. The couple did not have children together, but they each had children from other marriages. At the time of the decree in 2003, Jean was thirty-eight. She had been employed throughout most of the marriage as a registered nurse and earned approximately $44,000 per year. She contributed to social security and also had a private pension plan. Clayton was forty-six and was employed by the United States Postal Service, where he had worked since 1975. He earned approximately $62,000 per year and participated in two retirement systems: civil service retirement, which is in lieu of social security, and a Thrift Savings Plan, which is similar to a 401(k) plan.

Clayton suffered a stroke in 2001, and he continues to have residual effects from it. He testified that he might lose his job because the complications from his stroke often caused him to miss work. Although he was able to use sick leave to cover most of his absences up to the time of trial, he only had eight hours of paid sick leave left, and he speculated that he would need to take leave without pay in the future, or possibly take early retirement.

Three months after Jean filed for dissolution, the district court entered a temporary order resolving the couple's disputes concerning their home; Clayton wanted to keep it, while Jean wanted to sell it. The court ordered the parties to sell the home, but granted Clayton temporary possession until it was sold, provided he pay the first and second mortgage payments. Clayton, however, failed to pay the first mortgage installments, which resulted in the initiation of foreclosure proceedings and $1610 in attorney fees. He also refused to produce the abstract for continuation, claiming it was lost, resulting in an $835 replacement fee.

After receiving an offer on the house, Clayton refused to sign the deed and closing documents. On April 30, 2003, the district court ordered the sale of the house

without Clayton's signature. Between the time the parties received the offer to buy and the closing, Clayton's son burned a large hole in the carpeting, resulting in a $1500 deduction from the sale price. Clayton asked if he could keep some patio bricks, and the buyers agreed, deducting $1000 from the sale price. Clayton took some patio flagstones as well, resulting in another $1286 deduction.

## II. *The District Court's Property Award.*

A. *The house.* The district court divided the proceeds of the house sale by taking the gross sale price and deducting the mortgage balances to come to a net amount for distribution of $46,528.77. The court divided that figure in half, allocating $23,264.38 to each party. The court then deducted from Clayton's share all of the expenses, such as the delinquent mortgage payments accrued while he was under court order to pay them, the deduction for the bricks and flagstones, the foreclosure costs caused by his failure to pay the mortgage payments, damage to the carpet, the replacement of the abstract, and cleaning and moving expenses. As a result of these expenses, the district court concluded that Jean should receive $38,996.22 and Clayton should receive $7532.54 from the house proceeds.

Clayton complains that this distribution is inequitable to him because the $46,528.77 received from the buyers already reflected the items set out above for which Clayton was ultimately required to reimburse Jean. He contends that to deduct them again in computing his share effectively charges him more than once for the reduction in value he caused.

The net sale proceeds were $46,528.77. The district court deducted from Clayton's share all of the expenses caused by him, which included:

| | |
|---|---:|
| Bricks and flagstones | $ 2,286.00 |
| Carpet damage | 1,500.00 |
| Clayton's court-ordered mortgage payments | 8,900.15 |
| Abstract replacement | 835.00 |
| Attorney fees on foreclosure | 1,610.00 |
| Total expenses attributed to Clayton | $15,131.15 |

Adding this $15,131.15 to the net sale proceeds of $46,528.77 makes the amount the parties should have realized $61,659.92, if it had not been for Clayton's actions. Half of that amount is $30,829.96, and that is what Jean should be allowed (subject to adjustment for moving and cleaning expenses as discussed later). Clayton's $30,829.96 should be reduced by $15,131.15 for the expenses he created for a net of $15,698.81 (subject to adjustment for moving and cleaning expenses).

After the parties moved out of the home, Jean spent $203.52 for cleaning and $897.17 for moving expenses for a total of $1100.69. One-half of that amount, or $550.35, should be added to Jean's share of the sale proceeds and the same amount deducted from Clayton's share. Jean's total share of the sale proceeds is therefore $31,380.31 ($30,829.96 plus $550.35), and Clayton's total share is $15,148.46 ($15,698.81 less $550.35). The decree should be modified accordingly.

B. *The Thrift Savings Plan.* The district court divided Clayton's Thrift Savings Plan by treating it as a 401(k) retirement account. The court combined the total value of the couple's accounts and then split the sum equally between them. At the time of trial, Jean's account was valued at $5726.84 and Clayton's at $51,757.53. The total of the two accounts was $57,484.37, and each party was awarded half or $28,742.18. The district court awarded Jean her own retirement account plus $23,015.34 from Clayton's account to reach that total. The court then deducted Jean's attorney fees of $5000 from Clayton's share as well as $14,237.13, representing: the value of a 1994 Mazda, one-

half of Clayton's toy bank collection, "unreturned items" claimed by Jean, credit card charges, and one-half of the parties' bank account. The total of attorney fees and other charges to be deducted from Clayton's retirement account was $19,237.13, plus the $23,015.34, representing Jean's share of the parties' combined retirement accounts. The total deduction to be allocated to Jean from Clayton's thrift plan account amounted to $42,252.47. Clayton would retain only $9505.06. The court ordered that Jean's share would be secured by a qualifying domestic relations order (QDRO) to obligate the Thrift Savings Plan to pay this amount to Jean.

Clayton does not complain about the fifty-fifty division of the parties' accounts, but he does complain that the district court should not have reduced his thrift share to compensate Jean for her attorney fees and marital assets not related to retirement. He claims

> in doing so the Court mixed the concepts of the division of retirement assets with the division of non-retirement assets which is inappropriate and also fails to take into consideration ... the tax consequences of such a decision.

Clayton does not elaborate on what the "tax consequences" would be, but we agree that the court should not have taken the attorney fees and the value of nonretirement assets from the retirement fund. Jean is entitled to half the combined value of the parties' retirement accounts, or $28,742.18, and as we discuss later, she is entitled to the $5000 attorney fees and the value of the other assets of $14,237.13. However, she is not entitled to have her attorney fees and other claims established as charges against Clayton's Thrift Savings Plan. The decree and the QDRO should be modified to allow each party one-half of the parties' combined retirement accounts.

■ C. *Postal service retirement benefits.* Clayton, as an employee of the United States Postal Service, participates in the postal service retirement system, which is a government program for postal employees in lieu of social security. Jean participates in the social security program through her employment.

■ Pension benefits are generally treated as marital property that can be divided by the court. *In re Marriage of Howell,* 434 N.W.2d 629, 631 (Iowa 1989); *In re Marriage of Bevers,* 326 N.W.2d 896, 900 (Iowa 1982). Here, the district court allowed Jean one-half of Clayton's pension, accumulated during the marriage, which is to be payable on his retirement. Jean's share was determined by using a fraction with the numerator being the number of years during the marriage in which Clayton accrued benefits and the denominator the total years his benefits accrued. The district court allowed Jean fifty percent of Clayton's pension computed under this fraction.

On appeal Clayton concedes that Jean is entitled to a share of his retirement benefits; he contends only that she is entitled to a smaller share than that allocated by the district court. He argues that Jean's share should be only twenty-five percent of his accrued benefits computed under the above formula. The court of appeals reduced Jean's share to twenty-five percent because she is younger, healthier, has a longer expected work life, and she will have her own social security benefits on which to draw. Also, Clayton has no comparable claim to Jean's social security benefits. We conclude that twenty-five percent of Clayton's benefits, as computed above, is the appropriate percentage. The district court's decree as well as its QDRO should be modified accordingly.

■ D. *Disability payments.* In addition to retirement benefits, Clayton may be entitled to disability benefits as a result of his stroke. Clayton testified that he experiences chronic fatigue and other conditions that will likely require frequent absence from work and might shorten his postal service career. Representatives of the postal service human resources department testified that Clayton might well be forced to take disability status, resulting in substantially reduced income.

Clayton complains that, under the district court's decree, Jean would be entitled to receive fifty percent of any disability benefits he may receive. This would be inequitable, according to him, because if he begins to draw disability benefits, Jean will likely still be employed. In addition, the benefits Clayton would receive under disability would already have been reduced by about fifty percent by reason of his disability retirement. Clayton, approximately eight years older than Jean, faces an uncertain work future because of his health problems. He apparently has used over 900 hours of accumulated sick time and had only eight hours remaining at the time of trial. Jean, who claims no health problems, presumably will have a much longer work life.

■ Some disability benefits are to be considered the separate property of the disabled person and thus not divisible in a dissolution case. *See, e.g., In re Marriage of Schriner,* 695 N.W.2d 493, 498–99 (Iowa 2005) (holding workers' compensation benefits are separate property of injured person and not subject to division). However, if disability payments "effectively supplant[ ] retirement benefits, the disability payments are a divisible asset to the extent they are replacing retirement benefits." *In re Marriage of Geigle,* 83 Wash. App. 23, 920 P.2d 251, 255 (1996). Even if disability benefits only partially supplant retirement benefits, they are equivalent to retirement benefits and are therefore divisible. *See West v. West,* 101 A.D.2d 834, 475 N.Y.S.2d 493, 494–95 (N.Y.App.Div. 1984) ("[W]here a disability pension may, in part, represent deferred compensation, it is indistinguishable from a retirement pension and is, to that extent, subject to equitable distribution."); *see also Newell v. Newell,* 121 Misc.2d 586, 468 N.Y.S.2d 814, 816–17 (N.Y.Sup.1983).

Here, any disability payments to which Clayton might be entitled will supplant at least part of his retirement income. This fund, therefore, may be considered a divisible asset; Clayton, in fact, does not dispute this. He contends, however, that it would be inequitable under the circumstances for the court to give Jean a share of it. We agree; under these circumstances, it would be inequitable to subject Clayton's disability benefits to further reduction by requiring him to pay a portion of them to Jean. We therefore modify the district court's decree and QDRO to eliminate any award to Jean from Clayton's disability benefits.

■ E. *Other property division.* The district court divided other assets and debts of the parties, including a 1994 Mazda car, bank accounts, household goods, and credit card balances. We believe the court's division was reasonable, and we affirm it with respect to these matters.

### III. Attorney Fees.

■ The district court awarded Jean $5000 in attorney fees. Under the circumstances of this case, particularly considering Clayton's lack of cooperation in such matters as selling the home and providing discovery, the allowance was reasonable. We reject Clayton's claim to the contrary. The parties shall pay their own attorney fees on this appeal.

### IV. *Summary.*

We modify the district court's decree as follows: Jean shall be allowed $31,380.31, and Clayton $15,148.46, as their respective shares of the house-sale proceeds. Jean shall retain her retirement account, together with $23,015.34 from Clayton's Thrift Savings Plan. She shall also receive $14,237.13 for the miscellaneous assets she claims, twenty-five percent of Clayton's retirement account (but none of his disability benefits), and $5000 for her attorney fees in district court.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED AS MODIFIED; CASE REMANDED.**