# IN THE COURT OF APPEALS OF IOWA

No. 23-0791
Filed January 10, 2024

IN RE THE MARRIAGE OF CHEYENNE JO PECK
AND DAVID EDWARD PECK

Upon the Petition of
**CHEYENNE JO PECK,**
        Petitioner-Appellee,

**And Concerning**
**DAVID EDWARD PECK,**
        Respondent-Appellant.
_____

Appeal from the Iowa District Court for Webster County, Adria Kester, Judge.

A father appeals the financial, custody, and visitation provisions of the decree of dissolution. **AFFIRMED AS MODIFIED AND REMANDED WITH DIRECTIONS.**

Dani L. Eisentrager, Eagle Grove, for appellant.

Jessica A. Zupp of Zupp and Zupp Law Firm, P.C., Denison, for appellee.

Considered by Tabor, P.J., and Buller and Langholz, JJ.

**TABOR, Presiding Judge.**

David Peck appeals the custody, visitation, and financial provisions of the decree dissolving his marriage to Cheyenne Peck. He argues that the district court erred in four ways: (1) awarding physical care of the children to Cheyenne rather than joint physical care; (2) setting a visitation schedule that fails to provide for the maximum and continuing contact between him and the children; (3) incorrectly determining the parties' incomes; and (4) not dividing the marital assets equitably. He also asks for appellate attorney fees. Cheyenne defends the decree, and she also seeks appellate attorney fees.

We affirm the grant of physical care but modify visitation. We also affirm the court's imputing of income to both parties. But because no child-support-guidelines worksheet appears in the record we remand with instructions to recalculate and attach the worksheet. We affirm the division of property, including the court's determination that David dissipated marital assets. And we reject David's request for appellate attorney fees but award fees to Cheyenne.

## I. Facts and Prior Proceedings

David and Cheyenne married in 2013 and have three sons—eight-year-old C.P. and two-year-old twins, Da.P. and De.P. Cheyenne quit working outside of the home when their oldest was born to stay home with the children. Both parents have general education diplomas. At the time of the divorce, they were both thirty-two years old.

David was the primary breadwinner. He worked at C&S Products from 2014 to 2017. In 2017, he moved to National Gypsum, earning approximately $84,000 per year. He worked irregular hours, most often evenings. In June 2021, he left

to work at Georgia Pacific, which offered higher pay and better hours. But that job lasted only a week. After that, David decided to open a shop and work full time as a tattoo artist. So between July 2021 and when the tattoo shop opened in September, the family had little to no income. David cashed out his National Gypsum retirement account (about $10,000 after taxes) and took out a personal loan to keep the family afloat and open his shop. To cover his own expenses, David later spent a 2021 tax refund check (approximately $11,000) and an insurance payout for Cheyenne's totaled 2015 Yukon[1] (approximately $29,000) rather than paying off the loan on that vehicle.

The following spring, Cheyenne noticed changes in David. She testified he spent less time at home, often did not return from the tattoo shop, and when he was at home, he slept all day. Cheyenne was concerned about a recurrence of David's past drug use.

During a fight in February, David "body-slammed" Cheyenne and broke a computer tablet. In March, Cheyenne and David fought again. David punched a television and broke his hand. When Cheyenne ran to the driveway, David "yank[ed] [her] out of the car" while the kids were watching. That incident led to involvement from the Iowa Department of Health and Human Services and a child-in-need-of-assistance (CINA) proceeding. A child abuse investigation determined David was responsible for a denial of critical care for exposing the children to acts of violence. That incident also led to criminal charges for David, and a no-contact order between him and Cheyenne and the children. Cheyenne also testified to

---

[1] Cheyenne testified that a driver lost control of their vehicle and collided with her Yukon while it was parked in the Pecks's driveway, totaling it.

other incidents of domestic violence during their marriage. Ultimately, a jury acquitted David of domestic abuse assault for the March events.

Since he broke his hand, David could not do any tattooing work until June. He moved in with his new paramour, Danielle. The children remained with Cheyenne in the family home. As part of the ongoing CINA proceeding, David had a positive drug test for hydrocodone and oxycodone, after which he was reluctant to submit to further testing. The department recommended supervised visitation. But Cheyenne soon filed for divorce. And the department closed the CINA case. The juvenile court found there were no remaining safety concerns.

After a hearing on temporary matters, the district court ordered David to pay Cheyenne $5000 in attorney fees and $1899 per month in child support. But he only made two payments of $200. By the time of trial, he still owed attorney fees and $15,268 in child support.[2] Cheyenne testified that she got by with food stamps and help from her father. With the Yukon totaled, she had no vehicle, so her father bought a car, which they share. Also in the temporary order, the court directed visitation between David and the children to be supervised, subject to the parties' agreement on the supervisor.

Because they could not agree on family members to supervise, David arranged for and paid Head Start employees to supervise visitation, working on their personal time. Cheyenne objected to these supervisors because they were friends with David and his family and because she believed they were not providing

---

[2] The court sentenced David to serve fifteen days in jail for contempt for not paying.

adequate oversight. Because of their lack of agreement on supervisors, David's last visit with the children was January 15, 2023.

Coordinating visitation was not the only problem during this time. The parents' relationship was marked by immaturity and petty conflicts, which we will not recount except where necessary. Most concerning were David's many social media posts demeaning Cheyenne and one family photograph where he photo-shopped Cheyenne out, replacing her with Danielle.

The oldest child, C.P., experienced distress over the discord. C.P. started seeing a therapist after the parents separated. C.P.'s therapist was treating him for anxiety and a lack of focus. She testified C.P was afraid after seeing David assault Cheyenne. He was making progress and expressed that he misses his dad. The therapist had no other concerns about his psychological health.

At trial in March 2023, the parties sought joint custody but each wanted physical care; David also requested shared care. Cheyenne asked for supervised visitation. On the issue of child support, Cheyenne urged the court to impute income of $106,000 to David, but David thought it should be $30,000. He asked the court to determine his current income from his bank accounts, income tracking sheet, and expense tracking sheets. He also asked the court to impute some income to Cheyenne. For the property division, Cheyenne suggested the parties sell their 2019 Lincoln Navigator and use the proceeds to pay off the auto loan; but David asked to keep the Navigator and the debt. Cheyenne also asked the court to find David dissipated marital assets from the Yukon insurance payment, the 2021 tax refund check, and by giving a family vehicle to a friend.

After two days of trial, the court made express findings from the bench that David's testimony was not credible, with the exception that he "love[s] [his] children and want[s] to see them."[3] The decree granted joint legal custody with physical care to Cheyenne. Visitation was to be "as mutually agreed to by the parties," but alternatively by a prescribed visitation schedule. In determining child support, the court found David voluntarily reduced his earnings and was underemployed, imputing his income to be $64,690. It set Cheyenne's earning capacity at $8609 based on part-time work at $11 per hour. The court ordered David to pay child support "pursuant to the guidelines using the most credible evidence," but the court did not attach a guideline worksheet. The court awarded no spousal support. In dividing the marital estate, the court found David dissipated marital assets and determined on an equitable distribution of real and personal property.

David appeals.

## II. Standard of Review

Because dissolutions are equitable proceedings, our review is de novo. *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). We give weight to the

---

[3] The court said:

> Sir, I can tell you I don't find you credible whatsoever. I don't know if you don't know what the truth is, if you are easily confused. I don't know what it is, but I found most of your testimony to be not credible. And with that being said, I have no doubt that you love your children and want to see them. And just because you act a fool and can't seem to tell the truth and pay for everything under the sun except for your three kids . . . we don't hold visitation hostage just because you didn't pay what you needed to pay. But I'm telling you right now this is where the rubber hits the road, and you should be held accountable for the things that you have done. And I don't buy for one minute that you couldn't have found some kind of income to help support your children.

factual findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them. *Id.*

### III. Analysis

#### A. Physical Care

David first contends the district court erred in awarding Cheyenne physical care of the children rather than joint physical care. In considering physical care, our top concern is the children's best interests. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). We are guided by the factors enumerated in Iowa Code section 598.41(3) (2023) and those set out in *Hansen. In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974); *Hanson*, 733 N.W.2d at 700 (pointing to "an overriding interest in stability and continuity," communication and mutual respect between parents, the degree of discord between parents, and the extent of agreement between parents on routine care). "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695.

Cheyenne has been the primary caregiver for the children since they were born. *See* Iowa Code § 598.41(3)(a), (d). When C.P. was born, David and Cheyenne agreed that Cheyenne would be a stay-at-home parent. She testified David was not much involved with day-to-day care or appointments. She also recalled that David's participation in maintaining the household by cooking, cleaning, and laundry was "[a]bsolutely minimal." Even so, after the children were born, Cheyenne did work for pay part-time at a daycare. Just before the separation, she worked as a clerk in a paint shop until two or three in the afternoon,

leaving the kids with David, who worked evening shifts. But leaving the children with David proved difficult. She testified: "I would come home. They would be unchanged. The house would be a disaster. They would be hungry. They would have missed naps. He would be sleeping." David would also schedule tattoo appointments when he was supposed to be with the children, and Cheyenne would have to call her father to babysit.

David complains that he did not have adequate parenting time while the dissolution was pending because of the no-contact order and supervised visitation, which he argues Cheyenne limited by disapproving supervisors. *See id.* § 598.41(3)(d). He points out that the CINA case closed, and there were no remaining safety concerns about his parenting. *See id.* § 598.41(3)(i). He also concedes a high degree of conflict and lack of cooperation continued between the parents. *See id.* § 598.41(3)(c). But he blames Cheyenne.

In our view, neither party has been very supportive of the other's relationship with the children. *See id.* § 598.41(3)(e). Cheyenne has been picky about supervision. But as the district court found, many of Cheyenne's concerns about David's behavior were justified. At the trial, each party presented witnesses to disparage the other's ability to safely parent. But the district court did not find those witnesses particularly credible or persuasive. "The Court believes that neither party poses a safety concern to the children. Both parents have engaged in childish behavior not rising to the level of a safety concern." *See id.* § 698.41(3)(i). We agree with that assessment.

Yet we do find David's history of domestic abuse to be relevant. David notes that he was acquitted of the March incident, but we consider the history of

violence more broadly. *See id.* § 598.41(3)(j). David admitted physically abusing Cheyenne during the marriage; the child abuse investigation documented violence in the home; and the court found Cheyenne testified credibly to other abusive incidents. Like the district court, we find this factor weighs in favor of Cheyenne retaining physical care.

At bottom, we give most weight to the continuity-of-care factor. *See Hanson*, 733 N.W.2d at 696. It is in children's best interests to "preserv[e] the greatest amount of stability possible." *Id.* at 696–97. Cheyenne has been a careful and successful caregiver for the children's entire lives. And although respectful communication remains a challenge for both parents, David's history of domestic violence and disrespectful social media posts are most troubling. Because of those circumstances, we find Cheyenne is more likely to support David's relationship with the children than the other way around. We agree with the district court that granting Cheyenne physical care with liberal visitation for David is in the children's best interests, so we affirm that provision of the decree.[4]

### B. Visitation Schedule

"Upon awarding one parent physical care, the district court shall award the other parent visitation that assures the children 'the opportunity for the maximum continuing physical and emotional contact with both parents.'" *In re Marriage of Gensley*, 777 N.W.2d 705, 717 (Iowa Ct. App. 2009) (quoting Iowa Code § 598.41(1)(a)). David contends the court failed to establish such a schedule. The

---

[4] We also expect that removing supervised visitation and what amounted to veto power for Cheyenne over David's visitation will eliminate a source of tension from the parenting relationship.

court awarded visitation "as the parties agree," but given the degree of conflict, the fallback schedule is the one David challenges. That schedule provides David with parenting time every other weekend from 6:00 p.m. Friday to 6:00 p.m. Sunday and every Wednesday evening from 5:00 p.m. to 7:30 p.m. David argues the schedule is too restrictive and doesn't take into consideration that his tattoo work would be in the evening. David also argues the first order, that visitation would be as the parties agreed, is unworkable.

Given the degree of conflict and Cheyenne's tendency to withhold contact, we agree that allowing visitation "as mutually agreed to by the parties" is not realistic. We modify the decree to remove that clause of the visitation provision. The parties still have a right of first refusal as ordered in the decree and may decide to add more parenting time for David. In other words, "[t]his visitation schedule does not prohibit additional visits as may be mutually agreed upon by the parties." *In re Marriage of Bevers*, 326 N.W.2d 896, 899 (Iowa 1982). But asking the parties to agree on visitation as the first option is an invitation for more conflict.

As for the default parenting schedule set in the decree, we find it is in the children's best interests and achieves equity for the parties. *See In re Marriage of Brown*, 778 N.W.2d 47, 55 (Iowa Ct. App. 2009) (reviewing visitation determination for failure to do equity); *see also Hansen*, 733 N.W.2d at 695 (approving similar visitation schedule). Spending most weekdays at the family home with their mother provides the children needed stability. David has weekly evening and weekend overnights, as well as holiday and summer schedules. The parenting time provided allows him to maintain continuing physical and emotional contact

with the children. The schedule is in the children's best interests, and the district court did not fail to do equity, so we otherwise affirm. *Brown*, 778 N.W.2d at 55.

### C. Income Determinations and Child Support

David contends the court erred in its child-support award because it incorrectly set his earning capacity. "In determining child support under the guidelines, the court must determine both the custodial and noncustodial parent's net monthly income. Net monthly income is defined in the guidelines to be the gross monthly income less specifically enumerated deductions." *In re Marriage of Powell*, 474 N.W.2d 531, 533 (Iowa 1991). "'[G]ross monthly income' means reasonably expected income from all sources." Iowa Ct. R. 9.5(1). The focus is on income that is "reasonably expected," rather than "uncertain or speculative." *Markey v. Carney*, 705 N.W.2d 13, 19 (Iowa 2005). That said, "[c]hild support is generally not reduced because of self-inflicted or voluntary reductions in income." *In re Marriage of Fidone*, 462 N.W.2d 710, 712 (Iowa Ct. App. 1990). Courts may consider a wide range of evidence, focusing on the "most reliable evidence presented," to calculate a parent's income. *Powell*, 474 N.W.2d at 533.

Generally, the district court should use a party's actual income rather than imputing income, unless provided for by rule. Iowa Ct. R. 9.5(1)(d). Rule 9.11as relevant here, permits a court to impute income when failing to do so "would be unjust or inappropriate" because (1) "substantial injustice would result to the payor, payee, or child(ren)"; (2) "[a]djustments are necessary to provide for the needs of the child(ren) or to do justice between the parties, payor, or payee under the special circumstances of the case"; or (3) "a parent is voluntarily unemployed or underemployed without just cause." Iowa Ct. R. 9.11(1)–(3)

The district court had trouble deciphering David's earnings from the tattoo shop and found David lacked credibility regarding his earning capacity. David testified that he charges $150 per hour for tattoo sessions and a flat fee for smaller tattoos. He testified that an "established" tattoo artist in Iowa could make $35,000 to $43,000 per year. But he did not consider himself to be "established" yet. He also provided bank statements, income and expense tracking sheets, and a document labeled "Summary of how I spent income, insurance money, and Tax refund March 2022–March 2023." Finding that David was underemployed, the court used his employment history and his earning records from the previous five years, set out in his social security statement, and determined his earning capacity at $64,690 per year.

We find no error in the court's imputing of income to David. We defer to the court's strong credibility determinations. The record shows that David kept spare financial records for the tattoo shop and maintained a more extravagant lifestyle than afforded by the $18,000 in income he reported in his proposed child support guidelines worksheet or the $30,000 he proposed as his imputed income.[5] At his assault trial, David testified he was making more now than he made at National Gypsum, where his salary was $84,000 per year. His social media posts report that his business is thriving. David even hired a scheduler because he claimed to have hundreds of messages and requests for tattoo work. The court was within

---

[5] David spent freely in 2022 and early 2023. For example, he went on six trips out of state, got a tattoo from a famous artist for $2700, purchased a gold necklace for $2360, gave a friend a car valued at $7000, gave Danielle money, sponsored Fort Dodge High School Cheer, sponsored a car racing team, and bought the children iPads for Christmas.

its discretion to disregard David's estimate of earnings for a tattoo artist given his overall lack of credibility. The most reliable evidence in the record supports the imputed income determination.

Since the separation, Cheyenne has worked in hotel housekeeping, earning $11 per hour. She had to quit in July 2022 because her daycare closed. She then enrolled in online college classes at a community college. But the court imputed part-time income of $8609 to her. Based on those imputed incomes, the court ordered David to pay $1494 per month in child support according to the guidelines. But the court did not attach a guidelines worksheet to the decree. We conditionally affirm the award but on remand the district court shall attach the guidelines worksheet and, if necessary, adjust the final amount. *See In re Marriage of Lewis*, No. 17-1983, 2019 WL 1752652, at *6 (Iowa Ct. App. Apr. 17, 2019) (directing that record include child support calculation worksheet).

### D. Asset Division/Dissipation

David also challenges the district court's finding that he dissipated assets and contests the distribution of property. Marital property is to be divided equitably considering the factors in Iowa Code section 598.21(5). An equitable distribution is not necessarily equal. *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021). In the division, we may consider whether a party dissipated marital assets. *In re Marriage of Olson*, 705 N.W.2d 312, 317 (Iowa 2005). To determine if the challenged expenditure amounts to dissipation, the court considers:

> (1) the proximity of the expenditure to the parties' separation,
> (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage,

> (3) whether the expenditure benefited the "joint" marital enterprise or was for the benefit of one spouse to the exclusion of the other, and
> (4) the need for, and the amount of, the expenditure.

*In re Marriage of Fennelly*, 737 N.W.2d 97, 104–05 (Iowa 2007).

The district court found David "intentionally diverted funds from Cheyenne" when he took the 2021 tax refund and insurance settlement out of their bank account. The court ordered David to pay Cheyenne $21,546.57—equaling half of those sums. The court ordered no other equalization payment. But David complains that the court also included in its distribution and assigned to him the $10,000 he got from cashing out his retirement account. He asserts this cash-out happened before the separation and did not amount to dissipation. We agree that David did not dissipate those retirement funds. According to Cheyenne's testimony, those funds were deposited in November 2021 and used to support the family while David set up his tattoo shop before the separation. But since the amount is not reflected in the equalization payment, we cannot find the court failed to do equity and we decline to disturb the division.

Next, David challenges the distribution of the tax refund and insurance proceeds and argues they were not dissipated because he used them to support the family and pay business expenses. David points to his exhibit explaining how he spent the money. But deferring again to the court's credibility determinations, we cannot determine that the money went to family expenses. When questioned about the cash, David said he spent it "[p]aying numerous bills and everything else, trying to maintain my tattoo shop." Cheyenne testified that she did not see any of that money, receiving only a few hundred dollars in child support during the

pendency of the case. After our de novo review, we cannot find evidence to show those funds were transferred from the household accounts for the benefit of the joint marital enterprise. So we agree that David dissipated those funds.

David also challenges the assignment of the Chevy Malibu to his side of the balance sheet. David gave the Malibu to a friend without consulting Cheyenne. This provided no benefit to the family since it left Cheyenne without a vehicle. We will not disturb the court's placement of the Malibu on David's side.

David also challenges the court's valuation of certain assets. "Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible evidence." *Hansen*, 733 N.W.2d at 703. "[W]e ordinarily defer to the trial court when valuations are accompanied by supporting credibility findings or corroborating evidence." *Id.* We first consider David's purchase of a Louis Vuitton backpack in April 2022. On Facebook, he posted a photograph of himself holding it, declaring: "Your girl show me L-O-V-E, I dropped the O and the E, and just took the LV." Cheyenne valued the backpack at $5050. At trial, David claimed the bag was "a knockoff" and that Cheyenne could "absolutely" have the bag if she believed it was more valuable. In the property ledger, the court valued the bag at $100 but assigned a value of $5050 in David's column. On appeal, David asks for a correction of the court's ledger to show that he received property worth only $100 when the backpack was awarded to him. He contends this adjustment, combined with the other modifications he seeks, would show that "the distribution of assets is inequitable to the extreme." Cheyenne counters that even if the court erred in assigning a value of $5050 to David, "the net result can equitably stay the same." We agree with Cheyenne; correcting the ledger would not change the distribution.

David also challenges the court's assignment of a gold necklace to him. He argues the court valued the necklace, which he claims Cheyenne broke during an argument, at its purchase price of approximately $2360. He argues it is worth only the gold value because it is broken. But Cheyenne testified it was not broken because she has seen him wear it since. And he provides no alternative valuation. The valuation is "within the permissible range of evidence," and we see no reason to disturb it.

David next complains that the court valued his 2019 Lincoln Navigator at $70,000 and assigned it and the accompanying $58,555 outstanding debt to him. He believes the vehicle is worth $25,000 and faults the court for disregarding the evidence of its value he presented. David submitted a Kelly Blue Book printout with that value, but it is not clear on the printout what vehicle is being valued let alone what trim level or features. The printout also appears to value a vehicle with 140,000 miles on it. Given the dearth of credible evidence to support David's valuation, we will not disturb the court's determination.

Finally, David contends the court should reduce the value of the Harley Davidson motorcycle because Cheyenne destroyed it. At trial, David valued it at $2000, Cheyenne proposed $5000. The court agreed with Cheyenne and gave David the motorcycle. David does not argue how much the value of the motorcycle should be reduced due to any alleged damage, so we deem the argument waived. See Ingraham v. Dairyland Mut. Ins. Co., 215 N.W.2d 239, 240 (Iowa 1974).

In the end, all the court ordered David to pay Cheyenne for the property division was $21,546.57 representing her half of the tax refund and insurance

settlement. The rest of the marital assets and debts balance leave very little to reapportion. We cannot say the court failed to do equity, so we affirm.

### E. Appellate Attorney Fees

Both David and Cheyenne request appellate attorney fees. An award of appellate attorney fees is not a matter of right but rests in our discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). "We consider the needs of the party making the request, the ability of the other party to pay, and whether the party was required to defend the district court's decision on appeal." *Id.* After weighing those factors and considering her attorney's fee affidavit, we award Cheyenne appellate attorney fees in the amount of $4815.

**AFFIRMED AS MODIFIED AND REMANDED WITH DIRECTIONS.**