# IN THE COURT OF APPEALS OF IOWA

No. 25-0117
Filed December 3, 2025

IN RE THE MARRIAGE OF ANDREW MARK HARLAND
AND ALYSSA KATHLEEN HARLAND

Upon the Petition of
**ANDREW MARK HARLAND,**
    Petitioner-Appellant,

**And Concerning**
**ALYSSA KATHLEEN HARLAND,**
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Dallas County, Michael Jacobsen, Judge.

An ex-husband appeals the spousal support, physical care, and visitation provisions in the dissolution decree. **AFFIRMED AS MODIFIED AND REMANDED.**

Andrew B. Howie and Meredith Eck of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

Elizabeth Kellner-Nelson of Kellner-Nelson Law Firm, P.C., West Des Moines, for appellee.

Considered without oral argument by Tabor, C.J., and Greer and Buller, JJ.

**TABOR, Chief Judge.**

Andrew (Andy) Harland challenges the custody and spousal support provisions in the decree dissolving his marriage to Alyssa Harland. He contends the district court should have granted him physical care of their two sons or, in the alternative, given him more parenting time. He also disputes the amount and duration of the spousal-support award.

Because Alyssa has taken the lead in meeting the boys' everyday needs, we affirm the order granting her physical care. We also find the visitation schedule (Wednesday nights and every other weekend) provides the children with maximum continuing contact with their father while maintaining their routines. As for spousal support, we modify the duration of the award to seven years and add a clause to terminate the obligation upon either party's death or Alyssa's remarriage.

## I. Facts and Prior Proceedings

Andy and Alyssa wed in November 2008. They had been married just under sixteen years as of the dissolution trial. Andy was forty-four and Alyssa was forty-two at the time of trial; both were in good health. They have two children, C.M.H. (born in 2013) and J.A.H. (born in 2016). The boys attend public school in Perry, where both parents live.

Both Andy and Alyssa have their bachelor's degrees. But their work histories differ significantly. Andy owns and operates ACE hardware stores in Perry, Boone, and Jefferson. The trial record shows that his three-year average income was $623,583.96. By contrast, Alyssa dedicated most of her time to caring for the boys during the marriage. Before the marriage, Alyssa was employed as a

private school teacher in California for one year.[1] She then started sales work for Mary Kay Cosmetics. In the early years of their marriage, she also worked part time for a transportation company and a retirement home. After they had their first child, Alyssa quit working outside the home and sold Mary Kay Cosmetics full-time. Her success in cosmetic sales peaked in 2017 when she earned a pink Cadillac[2] and turned a net profit of $15,064.[3] Her sales were much lower from 2020 through 2023.[4] She also had been on the payroll at the ACE hardware stores until Andy filed for divorce. Alyssa testified that her intent was to remain a stay-at-home mom and "if there was room for career or whatever, then [she] would explore that after."

The record showed that eleven-year-old C.M.H. and eight-year-old J.A.H. were "extremely resilient" as they weathered their parents' separation. The boys attended therapy to help them with the transition. And they were bonded and comfortable with both parents. But the Child and Family Reporter (CFR) assigned by the court found that "the boys look primarily to Alyssa for emotional support, when they need something." The CFR also recognized that Andy was involved in the boy's lives. For example, he coached their baseball teams, and the ACE hardware stores sponsored the teams.

---

[1] That job did not require a license, and she was not qualified to teach in Iowa.

[2] A pink Cadillac is indicative of success at Mary Kay Cosmetics. The company leased the car to Alyssa for two years with the option to buy. She and Andy bought the Cadillac at the end of the lease.

[3] As Andy points out in his brief, Alyssa's gross sales in 2017 were $71,582.

[4] Andy and Alyssa provided diverging explanations for the fall-off. Andy testified that Alyssa was "obsessed with the End Times . . . that Christ's return was coming, and she decided that working [for] Mary Kay didn't matter." But Alyssa attributed her reduced earnings to post-Covid industry changes.

After separating, Andy and Alyssa struggled to communicate. On several occasions, when coordinating their children's schedules or planning transportation, communication broke down. Both parties blamed the other for the breakdowns, including an incident where C.M.H. ended up at his baseball game without his uniform shirt. Discussing that example, the district court observed that "[i]t appears that Alyssa attempted to accommodate Andy and the baseball schedule," but Andy saw the mix-up as another instance of Alyssa refusing to coparent.

As far as attending to the children's day-to-day needs, that role historically fell to Alyssa. She stayed at home with the children while Andy managed the hardware shops. She typically got the boys ready for school, but once they began attending separate schools, Andy helped with transportation. Alyssa testified that since he filed for divorce, Andy has taken on a larger role with the children. But she doubted whether that level of participation would continue. The CFR credited both parents' contributions but concluded that Alyssa is better suited to care for the children's long-term needs.

The trial occurred in October 2023. Each parent agreed to joint legal custody but asked for physical care. The district court found that it was in the children's best interests to grant Alyssa physical care. The court also ordered Andy to pay $3086 per month in child support for two children, which would be reduced to $2212 when C.M.H. turned eighteen.

On the economic side, the court divided the marital assets, awarding Alyssa the marital home debt-free, her Cadillac debt-free, several bank accounts, and all the retirement accounts, as well as a $1,200,000 equalization payment. Andy received his three ACE hardware stores, a boat and trailer, and the obligation to

make the equalization payment. For spousal support, Andy proposed that he pay Alyssa $2000 per month for three years. Alyssa requested $10,000 per month for ten years.[5] The district court awarded spousal support in the amount of $8000 per month for ten years to correspond with the time their children will be in school.

Andy appeals the physical care and spousal support provisions.

## II. Analysis

### A. Scope and Standard of Review

Dissolution of marriage proceedings are equitable actions. Iowa Code § 598.3 (2023). So our review is de novo. *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015). Although we review de novo, "[w]e give weight to the findings of the district court, especially to the extent credibility determinations are involved." *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007).

On spousal support challenges, we build in "considerable latitude" for the district court's discretion. *Id.* We avoid undue tinkering with those awards. *In re Marriage of Sokol*, 985 N.W.2d 177, 182 (Iowa 2023). But the district court's findings are not binding on appeal. *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 484 (Iowa 2012). We modify a spousal support award when it does not achieve equity. *Gust*, 858 N.W.2d at 406.

---

[5] In her requested relief she asked that the $10,000 be separate from child support. But at trial, counsel asked Alyssa: "So to be clear, I think your alimony request is $10,000 a month, but your goal is, whatever child support and alimony is, you need $10,000. It's not like you're asking for $15,000 a month; correct?" Alyssa answered: "Correct."

**B. Physical Custody and Parenting Time**

*Physical Care*. The parents agreed that joint physical care would not work given their communication difficulties; both asked that physical care be placed with them. The district court awarded physical care to Alyssa. Andy contests that award on appeal.

After determining shared care is not in the children's best interests, "the court must next choose which caregiver should be awarded physical care." *Hansen*, 733 N.W.2d at 700. "The best interests of the children is the first and governing consideration in determining the primary care giver of the children." *In re Marriage of Walton*, 577 N.W.2d 869, 871 (Iowa 1998). The court gives considerable weight to the factors of continuity, stability, and approximation. *Hansen*, 733 N.W.2d at 700. "Stability and continuity factors tend to favor a spouse who, prior to divorce, was primarily responsible for physical care." *Id.* at 696. But just because a parent was the primary caretaker before separation does not guarantee an award of physical care. *In re Marriage of Kunkel*, 546 N.W.2d 634, 635 (Iowa 1996).

In awarding Alyssa physical care, the district court noted:

> Alyssa has been the primary care parent for the parties' children throughout the marriage. Andrew has taken on a larger role since the filing of the Petition, however, that does not change the fact that Alyssa has been the primary care parent. It is the children's best interest that Alyssa be awarded primary care of C.M.H. and J.A.H. subject to Andrew's parenting time.

Andy faults the court for limiting its consideration to the caregiving history in finding that physical care with Alyssa served the children's best interests. Andy's main grievance is Alyssa's inability to coparent, alleging her "lack of flexibility,

refusal to communicate, and lack of support for his relationship with the children." Andy argues that he would better facilitate the children's relationship with the non-physical care parent. He also points to his flexibility as a store owner to set his own schedule and care for his children.

After reviewing the record, we find no reason to upend the district court's decision. Neither parent has been a model for good communications. Both parents accuse the other of being inflexible. But the record does not support Andy's prediction that Alyssa will not support his relationship with the boys. She has already been doing so. For example, when Andy had to be out of town, she agreed to switch parenting days. When provided notice, Alyssa has allowed the children to spend time with Andy's family during her parenting time.

And it is important to maintain consistency for the boys. Without question, Alyssa has been the parent focused on the children's everyday needs. She helps them get ready for school, makes their lunches, cooks them dinner while Andy is working, and puts them to bed. True, Andy has been more involved since filing for divorce. But that doesn't change our best-interests analysis. From our de novo review of the record—including the CFR's recommendation—we reach the same conclusion as the district court. Awarding physical care to Alyssa was in the children's best interests.

*Parenting Time.* Having affirmed the physical-care award, we turn to Andy's request for more parenting time. The schedule in the decree gives Andy visitation every Wednesday evening and every other weekend.

Courts must grant "liberal visitation rights where appropriate" to assure children have "the opportunity for the maximum continuing physical and emotional

contact with both parents." Iowa Code § 598.41(1)(a). But visitation should not be "unduly disruptive." *In re Marriage of Bevers*, 326 N.W.2d 896, 899 (Iowa 1982). The current schedule provides ample contact between Andy and his sons while not unduly disrupting the boys' lives. Andy admitted at trial that J.A.H. gets homesick during long visits and asks to call Alyssa. Given these circumstances, expanding Andy's parenting time would not be in the children's best interests.

## C. Spousal Support

*Amount and Duration.* Iowa now recognizes four forms of spousal support: rehabilitative, reimbursement, traditional, and transitional. *Sokol*, 985 N.W.2d at 185. Describing its award as a hybrid of all four varieties, the district court ordered Andy to pay Alyssa spousal support of $8000 per month for ten years. Andy challenges that order, asserting that his obligation is too high and too long, considering the amount of property that Alyssa received in the decree. He also contends that Alyssa has a greater earning capacity than acknowledged by the district court: "[s]he is in good health and there is nothing preventing her from working except her voluntary choice not to." Andy insists that she does not qualify for traditional or reimbursement alimony. Instead, Andy asks us to find that a hybrid award of $2000 per month for three years is appropriate for transitional and rehabilitative purposes.

Awarding spousal support is a matter of discretion and depends on the facts of each case. *In re Marriage of Mann*, 943 N.W.2d 15, 20 (Iowa 2020). In making this decision, we consider these statutory factors:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.

c. The distribution of property made pursuant to section 598.21.

d. The educational level of each party at the time of marriage and at the time the action is commenced.

e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.

g. The tax consequences to each party.

h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.

i. The provisions of an antenuptial agreement.

j. Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21A(1).

"The goal in awarding alimony is to do equity." *In re Marriage of Pazhoor*, 971 N.W.2d 530, 541 (Iowa 2022). We also recognize that "institutional deference" to the district court's determination weighs against "undue tinkering" with a spousal support award. *Sokol*, 985 N.W.2d at 182. But here we find a failure to do equity that requires an adjustment to the spousal support award.

To start, the four types of spousal support awards serve different purposes. *See generally Pazhoor*, 971 N.W.2d at 543−45. Granted, hybrid awards are allowed. *In re Marriage of Becker*, 756 N.W.2d 822, 827 (Iowa 2008) ("[T]here is nothing in our case law that requires us, or any other court in this state, to award only one type of support."). But it is incongruous to find all four types are warranted in one case. After reviewing the record, we agree with Andy's assessment that

reimbursement and traditional spousal support are not warranted. Instead, it is appropriate to award Alyssa rehabilitative spousal support.[6]

First, Alyssa is not entitled to reimbursement alimony. That category is based on "economic sacrifices made by one spouse during the marriage that directly enhance the future earning capacity of the other." *In re Marriage of Francis*, 442 N.W.2d 59, 64 (Iowa 1989). It is most appropriate when the spouse who contributed to the other's earning capacity "cannot otherwise be compensated for their contributions." *Pazhoor*, 971 N.W.2d at 544. It is typically awarded when one spouse supported the other through educational endeavors during a short-term marriage. *See In re Marriage of Probasco*, 676 N.W.2d 179, 186 (Iowa 2004) (neglecting to award reimbursement alimony because it was not a short-term marriage and "neither [spouse] contributed to the education of the other"); *see also Pazhoor*, 971 N.W.2d at 545 (contrasting *In re Marriage of Lalone*, 469 N.W.2d 695, 697 (Iowa 1991), where the court did not award reimbursement alimony, with *Francis*, 422 N.W.2d at 61, 64–66, where the court found it proper).

Here the district court found reimbursement alimony was appropriate "because Alyssa's economical sacrifice during the marriage directly enhanced Andy's future earning capacity through the ACE Hardware stores he owns." But Alyssa didn't make the type of sacrifice warranting reimbursement; she worked at Mary Kay Cosmetics before marriage and did not give up that career during the marriage. In fact, her most successful sales year was when she was married. As

---

[6] We are hesitant to embrace Andy's view that "Alyssa's short-term need justifies a hybrid of transitional and rehabilitative alimony." As our supreme court has explained: "Transitional spousal support and rehabilitative spousal support are separate and distinct and serve different purposes." *Sokol*, 985 N.W.2d at 187.

far as education goes, Alyssa did not support Andy through any educational endeavor to contribute to his future earning capacity. Andy received his bachelor's degree in business administration before they married. For these reasons, an award of reimbursement alimony was inappropriate.

Next, we turn to traditional spousal support, which is typically awarded in marriages lasting twenty or more years. Traditional alimony permits the "recipient spouse to maintain the lifestyle to which he or she became accustomed." *Sokol*, 985 N.W.2d at 185. "The duration [of traditional spousal] support should correspond with need." *Id.* So it is usually "payable for life or for so long as the dependent is incapable of self-support." *Francis*, 442 N.W.2d at 64.

Here, the district court found traditional alimony was appropriate because of the "substantial difference" between the parties' earning capacities and "to allow Alyssa to continue to live at the same standard of living that she enjoyed during their marriage." Andy argues that they were married for less than sixteen years and that Alyssa can support herself. Alyssa points out that our courts have awarded traditional spousal support in shorter marriages.

It's true that our courts sometimes award traditional spousal support when a marriage has lasted for less than twenty years. But those awards are not the norm, especially when the spouse seeking support can become self-supporting. *See In re Marriage of Witherly*, 867 N.W.2d 856, 860 (Iowa Ct. App. 2015) (affirming a traditional award of spousal support because there "was scant evidence she could become self-supporting in the near term" but reducing the amount after five years when she could recover her earning capacity). The instant facts don't support an exception. Alyssa has her college degree and has worked,

at least part-time, in different ventures during the marriage. While her earning capacity may be more limited than Andy's, her sales skills and other assets show that she can become self-supporting in the not-so-distant future.

From that premise, we find that rehabilitative spousal support best fits Alyssa's situation. Her needs go beyond solving a "short term liquidity crunch." *Sokol*, 985 N.W.2d at 181 (explaining that transitional spousal support is appropriate when a spouse with earning capacity needs "short-term financial assistance to transition from married to single life"). On the other hand, rehabilitative alimony supports "an economically dependent spouse through a limited period of re-education or retraining" to help them become self-sufficient. *Id.* at 186 (citation omitted).

When reviewing Alyssa's award, we find that the ten-year duration does not align with the limited purpose of rehabilitative support. On the flipside, we find that Andy's proposal of $2000 per month for three years is too low and too short to allow Alyssa to become self-sufficient. Instead, we find it equitable to end the $8000 monthly stipend after seven years. *See Witherly*, 867 N.W.2d at 859 (finding that "hallmarks of rehabilitative alimony" are self-sufficiency and a definite end to the award). That duration balances Alyssa's parenting duties while the boys are still young with her ability to seek education or training for a career as they become more independent as teenagers.

*Termination of Spousal Support*. Andy also asks us to modify the spousal support award to terminate upon either party's death or Alyssa's remarriage. "[A]limony is presumed to automatically terminate upon the death of the recipient spouse." *In re Marriage of Wendell*, 581 N.W.2d 197, 199 (Iowa Ct. App. 1998).

And subsequent remarriage "shift[s] the burden to the recipient to show extraordinary circumstances to justify its continuation." *Id.* (citation omitted); *see also In re Marriage of Ales*, 592 N.W.2d 698, 704 (Iowa Ct. App. 1999) ("[A] change in status, like remarriage, may alter the support picture and warrant a modification of rehabilitative alimony"). For these reasons, it "is common in Iowa for alimony provisions in a decree for dissolution of marriage to include conditions providing for alimony to automatically terminate . . . upon death or remarriage of the recipient spouse." *Id.* We find termination upon either party's death or Alyssa's remarriage appropriate here, so we modify the decree to include those conditions.

### D. Appellate Attorney Fees

Lastly, Alyssa requests $6000 in appellate attorney fees. We do not award appellate attorney fees as a matter of right. *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). Instead, any award rests in our discretion. *Id*. In exercising that discretion, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (citation omitted). We find an award is merited given Alyssa's need and Andy's ability to pay. But we note that Andy was partially successful in his appellate challenges. In balancing those factors, it is appropriate to award Alyssa three-quarters of the reasonable and necessary fees she incurred on appeal. Because we do not have an attorney fee affidavit filed on her behalf to determine the amount of such fees, we must remand for the district court to make that decision. *See In re Marriage of Heiar*, 954 N.W.2d 464, 473–74 (Iowa Ct. App. 2020).

We assess the costs of the appeal to Andy.

**AFFIRMED AS MODIFIED AND REMANDED.**